**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

|   |   |
|---|---|
| **EDWARDS VACUUM LLC**, | Case No. 3:20-cv-1681-AC |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **HOFFMAN INSTRUMENTATION SUPPLY, INC. d/b/a/ HIS INNOVATIONS GROUP; MARK ROMEO; JEFFREY SCHWAB; JOSHUA RATCHFORD; COLLIN MUNDUS; ELISHA LEVETON; RICHARD DATE; JONATHAN DIRKSEN; JOHN CHADBOURNE; ANDREW ENSELEIT; TRAVIS HOVDE; CHAD COOK; TOBY DOUGLAS STANLEY; and PAUL ANDERSON** | |
| Defendants. | |

Nicholas F. Aldrich, Jr., Scott D. Eads, and Jason A. Wrubleski, Schwabe, Williamson & Wyatt PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; and John D. Vandenberg, Klarquist Sparkman llp, One World Trade Center, 121 SW Salmon Street, Suite 1600, Portland, OR 97204. Of Attorneys for Plaintiff.

David H. Angeli, Joanna T. Perini-Abbott, Edward A. Piper, and Michelle Holman Kerin, Angeli Law Group llc, 121 SW Morrison Street, Suite 400, Portland, OR 97204; and Michael E. Haglund and Eric J. Brickenstein, Haglund Kelley llp, 200 SW Market Street, Suite 1777, Portland, OR 97201. Of Attorneys for Defendant Hoffman Instrumentation Supply, Inc.

Jeff S. Pitzer and Peter M. Grabiel, Pitzer Law, 210 SW Morrison Street, Suite 600, Portland, OR 97204. Of Attorneys for Defendants Mark Romeo, Jeffrey Schwab, Joshua Ratchford, Collin Mundus, Elisha Leveton, Richard Date, Jonathan Dirksen, John Chadbourne, Andrew Enseleit, Travis Hovde, Chad Cook, Toby Douglas Stanley, and Paul Anderson.

**Michael H. Simon, District Judge.**

Plaintiff Edwards Vacuum, LLC (Edwards) brings this lawsuit against Hoffman Instrumentation Supply, Inc., doing business as HIS Innovations Group (HIS), and 13 individual employees of HIS formerly employed by Edwards (the Individual Defendants). Edwards alleges misappropriation of trade secrets, breach of contract, tortious interference with economic relations, conversion, breach of the duty of loyalty, civil conspiracy, and unjust enrichment. Earlier in this action, the Court entered a two-tiered Stipulated Interim Protective Order (Protective Order), and Edwards moved for a preliminary injunction. Edwards seeks preliminarily to enjoin HIS from making, selling, offering to sell, shipping, or otherwise using any product containing Edwards's asserted trade secrets. The parties are engaged in expedited discovery in preparation for the preliminary injunction hearing.

HIS seeks to retain the services of Mr. Roopinderjit S. Bath (Mr. Bath) as an expert witness in this case. As required by the Protective Order, HIS disclosed to Edwards that HIS intends to work with Mr. Bath and share with him certain information designated by Edwards as "Highly Confidential–Outside Attorneys Eyes Only" (OAEO). Edwards objects to Mr. Bath serving as an expert witness for HIS, based on Mr. Bath's prior knowledge of Edwards's confidential technical information learned while he was working for one of Edwards's key customers, with whom Edwards has confidentiality agreements. Edwards also objects to HIS sharing OAEO information with Mr. Bath, based on the patent prosecution bar in the Protective Order (Patent Prosecution Bar).[1] Now before the Court is Edwards's motion to disqualify Mr. Bath as an expert witness and to enforce the Patent Prosecution Bar. For the reasons stated

---

[1] Edwards does not object to Mr. Bath testifying as a percipient witness or receiving information designated under the Protective Order simply as "confidential."

below, the Court will not disqualify Mr. Bath from serving as HIS's expert witness or from

receiving Edwards's OAEO information, subject to the conditions specified in this Opinion and

Order.

## BACKGROUND

### A. The Parties and this Lawsuit

Edwards designs, manufactures, and sells highly specialized vacuum pumps and related

equipment used in the field of semiconductor, or computer chip, manufacturing. These pumps

are used to evacuate air and other gases from vacuum chambers where semiconductor

manufacturing processes take place. In a typical semiconductor manufacturing facility, process

tools (including robots) perform various tasks in chambers maintained under vacuum pressure.

Vacuum pumps are used to maintain that vacuum pressure and evacuate byproducts from the

chambers. In addition, these vacuum pumps connect to the process tools through complex piping

systems. The requirements for semiconductor manufacturing are stringent, and the vacuum

pumps tie into multiple complex systems within a manufacturing facility that sometimes employ

thousands of specialized vacuum pumps to support the semiconductor manufacturing processes.

The pumps, each suited to the unique and exacting requirements of the specific manufacturing

processes they support, can cost up to $40,000 per unit. Compl., ¶ 2 (ECF 1); ECF 51 at 6.

At least 20 years ago, Edwards began to develop an integrated vacuum pump system to

support a key customer engaged in semiconductor manufacturing. Compl., ¶ 3. An integrated

vacuum pump system combines an array of vacuum pumps into a single chassis with discrete

connections to various systems, with the vacuum pumps and supporting components "stacked" to

optimize the equipment's "footprint" in valuable facility space. For example, such a system

could provide minimal points of connection to and from the semiconductor fabrication tool, as

well as many other facility systems like nitrogen, process chilled water, electricity, and exhaust

piping, distributing those utilities to all vacuum pumps in a single chassis. The integrated system can also use a central computer to monitor and control the integrated system and each of the discrete vacuum pumps. That computer could then tie into the various monitoring and safety systems within the manufacturing facility. An integrated system, combining all vacuum pumps that support a specific manufacturing process, can trim the footprint of the equipment and provide many efficiencies in installation and operational costs. Compl., ¶ 3. Edwards alleges that it has spent 30 years, $100 million, and more than 100,000 person-hours designing, developing, and improving upon these systems, which are now sold under the brand names "SynErgis" and "eZenith." Compl., ¶ 4. Edwards sells its SynErgis brand exclusively to Company X, and Edwards sells its eZenith line to its other customers.[2] ECF 51 at 6.

One of Edwards's suppliers for proprietary parts for its SynErgis system was Defendant HIS, a local equipment supplier that makes pipes, valves, and other mechanical components. According to Edwards, as part of that relationship, Edwards provided HIS with substantial confidential information, including diagrams and details of dozens of specific, custom-specified parts used in Edwards's integrated systems and descriptions of how those parts were used. Edwards shared this information with HIS under a nondisclosure agreement, which prohibited HIS from using any of this information for unauthorized purposes. Compl., ¶ 5.

By early 2019, Edwards had opened a new, state of the art manufacturing facility to consolidate its efforts for its SynErgis system, including design, manufacturing, sales, marketing, and service. Edwards alleges that one of the key Individual Defendants working on designing Edwards's systems, including SynErgis, was hoping to be appointed general manager of that

---

[2] To protect the confidentiality of that customer, the parties have requested, and the Court has agreed, to refer to that customer simply as "Company X."

facility. When he was passed over for this promotion, he left Edwards and took a position as President and Chief Innovation Officer at HIS. According to Edwards, HIS never manufactured a vacuum pump and had no experience designing, developing, or manufacturing integrated vacuum pump systems. Compl., ¶ 6. Two days later, another key member of Edwards's systems design team also left Edwards to join HIS as its Director of Engineering. During the next several months, at least a dozen other Edwards employees left Edwards to join HIS. Compl. ¶ 7.

Edwards asserts that within about a year after the departure of these employees, HIS had designed, developed, and manufactured an integrated system that directly competes with Edwards's SynErgis system and that one such system is being "qualified" at Company X, one of Edwards's key customers. After that qualification process has been completed, Edwards contends, HIS may be able to deploy hundreds or even thousands of these systems at Company X's manufacturing facilities in Oregon and throughout the world. Compl., ¶ 8. According to Edwards, HIS's integrated system bears a striking resemblance in many important respects to Edwards's SynErgis system. *Id*. Edwards adds that it would have been impossible for HIS to develop its competing system in just one year without using Edwards's trade secrets because it took Edwards three decades to solve the many engineering challenges necessary to develop such a system, solutions that Edwards asserts it has closely guarded as trade secrets. Compl., ¶ 9.

**B.  The Protective Order, Including Its Patent Prosecution Bar**

Edwards filed its Complaint in this lawsuit on September 29, 2020, and after conducting some expedited discovery, filed a motion for preliminary injunction on November 16, 2020. The Court has scheduled a hearing on that motion for February 18, 2021. In preparation for that hearing, Edwards and HIS currently are engaged in additional discovery. Under the two-tiered

Protective Order (ECF 14), Edwards is providing certain highly confidential information to HIS, which Edwards has designated "OAEO."

Under the Protective Order, documents and other information designated OAEO may be shared by the receiving party only with: (1) outside counsel for the receiving party; (2) the receiving party's "[i]ndependent consultants or expert witnesses, and their employees, retained by a party or its attorneys solely for purposes of assisting counsel and a party in this litigation"; (3) the Court and its personnel; (4) the authors and the original recipients of the documents; (5) court reporters or videographers; and (6) persons providing outside litigation support services. Protective Order, ¶¶ 6-7. Before a receiving party may disclose information designated by a producing party under the Protective Order as either confidential or OAEO to an independent consultant or expert witness, the receiving party must provide to the producing party, among other things, "the identities and roles of the persons to whom such disclosure will be made[.]" Protective Order, ¶ 6. The producing party may then object to disclosure to that person or otherwise seek relief from the Court. *Id*. Further, "the party seeking to protect a document from disclosure bears the burden of establishing good cause for why the document should not be disclosed." Protective Order, ¶ 11.

The Protective Order also contains a Patent Prosecution Bar, which states:

> Absent written consent from the producing party, any individual who receives access to "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY" information shall not be involved in the prosecution of patents or patent applications pertaining to vacuum pumps or vacuum pump systems before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"). To ensure compliance with the purpose of this provision, each Party shall put into place a screen sufficient to ensure that persons involved in prosecution of such patents or patent applications shall not have direct or indirect access to any documents or information designated under this Interim Protective Order as "HIGHLY CONFIDENTIAL—

OUTSIDE ATTORNEYS' EYES ONLY." For purposes of this paragraph, "prosecution" includes directly or indirectly drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims. To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party in a proceeding involving a challenge to a patent before a domestic or foreign agency (including, but not limited to, a reissue application, ex parte reexamination, inter partes reexamination, post grant review, or inter partes review). The "Prosecution Bar" set forth in this section shall begin when access to "HIGHLY CONFIDENTIAL—OUTSIDE ATTORNEYS' EYES ONLY" information of a technical nature is first received by the affected individual and shall end two (2) years after final termination of this action.

Protective Order, ¶8 (ECF 14).

## C.  HIS's Preferred Expert Witness, Mr. Bath

To assist HIS in this lawsuit, including responding to Edwards's motion for preliminary injunction, HIS seeks to retain the services of Mr. Bath. According to his declaration, Mr. Bath currently works for NASA at the Jet Propulsion Laboratory in Pasadena, California. Bath Decl., ¶ 1 (ECF 58). Mr. Bath previously worked for Company X in Oregon, and his most recent role at Company X, which he held from 2013 to 2019, was R&D Engineering Group Lead. In that position, Mr. Bath procured, integrated, and otherwise worked closely with much of the equipment that Company X uses in its semiconductor manufacturing process, including, but not limited to, the type of equipment at issue in this lawsuit. Among other things, Mr. Bath worked closely with equipment that Company X purchased from Edwards, HIS, and other vendors. *Id.* ¶ 2.

In his declaration, Mr. Bath explains that, based on his experience working with vacuum pumps while at Company X, he has significant and specialized knowledge related to the vacuum pump equipment that is commonly used in semiconductor manufacturing. Mr. Bath believes that, aside from current employees at Company X and perhaps current employees of other chip

manufacturers, there are few others who have the level of knowledge and experience that he has in this area. Moreover, based on his experience at Company X and in the semiconductor industry more generally, Mr. Bath states that it is unlikely that individuals who are currently employed by Company X or other chip manufacturers would be willing or permitted to perform outside expert consulting work. In support of this conclusion, Mr. Bath attaches to his declaration the 2018 code of conduct for Company X, which is available on that company's public website. *Id*. ¶ 4.

While he was employed by Company X, some of his work was governed by contracts between Company X and the sellers of equipment to Company X, including Edwards. Many of those contracts included Company X's standard nondisclosure agreement (NDA). Mr. Bath states that he believes these NDAs were primarily used to protect against disclosure of Company X's (and not the equipment seller's) confidential information, and when he was expected to receive confidential information belonging to a third party, he would normally be asked to sign a separate restricted use nondisclosure agreement (RUNDA), which, to his knowledge, was used to protect against disclosure of the third party's confidential information. To the best of his recollection, Mr. Bath was never asked to sign a RUNDA relating to Edwards. *Id*. ¶¶ 6-7.

Mr. Bath also is the named inventor on a U.S. patent application (Patent Application) assigned to Company X. The general subject matter of the Patent Application is an interface that can be used in an integrated circuit chip manufacturing facility to standardize how utilities, including water, gases, chemicals, and electricity, pass between the manufacturing area and a manufacturing tool. One of the inputs to the interface described in the Patent Application can be a vacuum pump. The Patent Application, however, does not describe or relate to any specific type of vacuum pump, or any other specific aspect of vacuum pump technology. A vacuum

pump is simply one of many possible tools that can be used with the interface. Mr. Bath states that he has reviewed both the original and pending claims of the Patent Application, and he believes that they in no way relate to vacuum pump technology. *Id*. ¶¶ 8-9

The Patent Application claims priority to an international application filed in December 2014. After he assigned his rights in the subject matter of the international application to Company X in 2014, Mr. Bath does not recall having any involvement in the patent work relating to that technology, either at Company X or after he left that company. He now knows that the Patent Application was filed in January 2017 and that the claims of that application have been rejected and amended several times since then. To the best of his recollection, Mr. Bath has had no involvement in these amendments or the corresponding responses to the Patent Office. Further, Company X has not kept Mr. Bath informed about the progress of the application or asked for his input. *Id*. ¶ 10.

From about 2008 to 2019, Mr. Bath was a member, and later the leader, of a group within Company X that controlled the specifications for products delivered to Company X by its suppliers, including Edwards's SynErgis products. According to Edwards, as both a member and a leader of that group, Mr. Bath was provided with the complete range of Edwards's confidential technical information relating to SynErgis, including the alleged trade secrets at issue. Edwards adds that its confidential technical information was disclosed to Mr. Bath and his group under the protection of nondisclosure agreements between Edwards and Company X. *See* Fowler Decl., ¶¶ 6-8 (ECF 52); *see also* Bath Decl., ¶2 (ECF58).

Finally, Edwards notes that in Mr. Bath's assignment of the Patent Application to Company X, he agreed to

> execute all Additional Applications, and all other patent
> applications on any and all said inventions and improvements;

execute all rightful oaths, assignments, powers of attorney; and
other papers; communicate to [Company X] all facts known to
[Mr. Bath] relating to said inventions and improvements and the
history thereof; and generally assist [Company X] in securing and
maintaining proper patent protection for said inventions and
improvements and for vesting title to said inventions and
improvements, and all applications for patents and all patents on
said improvements, in [Company X.]

ECF 53-3 at 2.

## DISCUSSION

### A. Edwards's Motion to Disqualify Mr. Bath from Serving as HIS's Expert Witness

Edwards asserts that in Mr. Bath's previous roles at Company X, he received a large

volume of Edwards's confidential technical information, including the alleged trade secrets at

issue, while in a position of trust under nondisclosure agreements between Edwards and

Company X. Edwards argues that courts routinely preserve the integrity of the judicial system by

excluding experts who would violate such prior confidences if allowed to testify. Thus,

concludes Edwards, the Court should disqualify Mr. Bath from serving as an expert for HIS in

this case.

#### 1. Standards

"Federal courts have the inherent power to disqualify expert witnesses in certain

circumstances to protect the integrity of the adversary process and to promote public confidence

in the legal system." *Space Sys./Loral v. Martin Marietta Corp*., 1995 WL 686369, at *2 (N.D.

Cal. Nov. 15, 1995) (citing *Wang Labs., Inc. v. Toshiba Corp*., 762 F. Supp. 1246, 1248 (E.D.

Va. 1991); *see also Crenshaw v. MONY Life Ins. Co.*, 318 F. Supp. 2d 1015, 1026 (S.D. Cal.

2004) (stating that a court has the "inherent authority to disqualify experts"); *see generally*

Kendall Coffey, *Inherent Judicial Authority and the Expert Disqualification Doctrine*, 56 Fla. L.

Rev. 195 (2004).[3] A court should disqualify an expert, however, only "hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004).

"[C]ourts have declined to use a brightline rule to determine whether an expert should be disqualified." *Hewlett-Packard*, 330 F. Supp. 2d at 1092. Instead, "courts balance the policy objectives that favor disqualification—ensuring fairness and preventing conflicts of interest—against policies militating against disqualification, including guaranteeing that parties have access to witnesses who possess specialized knowledge and allowing witnesses to pursue their professional callings." *Oracle Corp. v. DrugLogic, Inc.*, 2012 WL 2244305, at *5 (N.D. Cal. June 15, 2012). In addition, because expert witnesses serve a different purpose than do advocates, the standards for disqualification of expert witnesses should be distinguished from the standards for disqualification of counsel. *See id.*; *Crenshaw*, 318 F. Supp. 2d at 1026; *Chrisjulbrian Co. v. Upper St. Rose Fleeting Co*., 1994 WL 673440, at *2 (E.D. La. Dec. 2, 1994); *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501 (D. Colo. 1993).

Much of the modern law about disqualification of an expert witness can be traced to the seminal case of *Paul v. Rawlings Sporting Goods Co*., 123 F.R.D. 271 (S.D. Ohio 1988). In that decision, the court established a two-prong test to resolve asserted conflicts of interest by an expert witnesses and related motions to disqualify experts. Under this test, courts consider (1) whether it was objectively reasonable for the moving party to conclude that a confidential relationship existed between client and expert; and (2) whether the moving party disclosed

---

[3] No federal statute or rule addresses whether, and if so when, a court should disqualify a party's preferred expert witness from testifying or otherwise participating in a case. Federal courts, however, possess certain "inherent powers," not conferred by statute or rule, "to manage their own affairs . . . to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quoting *Link v. Wabash R. Co*., 370 U.S. 626, 630–631 (1962)); *see generally* Jeffrey C. Dobbins, *The Inherent and Supervisory Power*, 54 Ga. L. Rev. 411, 442-43 (2020).

confidential or privileged information to the expert. *Id.* at 278; *see generally* Nina A. Vershuta, *New Rules of War in the Battle of the Experts Amending the Expert Witness Disqualification Test for Conflicts of Interest*, 81 Brook. L. Rev. 733, 741 (2016). In considering whether the disclosed confidential information was sufficient to justify disqualifying an expert witness, however, *Paul* emphasized the need for courts "to balance the competing policy objectives, and to reach a decision in each case which is the most consistent with promoting these policies as well as doing justice in the individual case." 123 F.R.D. at 282. Later, several jurisdictions refined these considerations and added a third prong, asking the judge to "balance the competing policy objectives in determining expert disqualification." *See, e.g.*, *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 580 (D.N.J. 1994) (citing *Paul*, 123 F.R.D. at 282); *see also* Vershuta, 81 Brook. L. Rev. at 755-56.

Thus, a court may "disqualify an expert based on a prior relationship with an adversary if '(1) the adversary had a confidential relationship with the expert,'" "(2) the adversary disclosed confidential information to the expert that is relevant to the current litigation," and (3) "disqualification is fair to the affected party and would promote the integrity of the legal process." *Oracle Corp.*, 2012 WL 2244305, at *6 (quoting *Hewlett-Packard*, 330 F. Supp. 2d at 1092-93); *see also Tabaian v. Intel Corp.*, 2018 WL 4566257, at *2 (D. Or. Sept. 22, 2018). "'The party seeking disqualification of an expert witness bears the burden of demonstrating that it was reasonable for it to believe that a confidential relationship existed,' and that such a relationship became sufficiently substantial to make disqualification appropriate." *Oracle Corp.*, 2012 WL 2244305, at *6 (quoting *Hewlett-Packard*, 330 F. Supp. 2d at 1093).

When determining whether an adversary had a confidential relationship with the expert, "[t]he emphasis . . . is not on whether the expert was retained per se but whether there was a

relationship that would permit the litigant reasonably to expect that any communications would be maintained in confidence." *Hewlett-Packard*, 330 F. Supp. 2d at 1093. In performing this analysis, courts consider many factors, including:

> whether the relationship was one of long standing and involved frequent contacts instead of a single interaction with the expert, whether the expert is to be called as a witness in the underlying case, whether alleged confidential communications were from expert to party or vice-versa, and whether the moving party funded or directed the formation of the opinion to be offered at trial[,]

*Stencel*, 174 F. Supp. 2d at 1083, and:

> whether the parties entered into a formal confidentiality agreement, whether the expert was retained to assist in the litigation, the number of meetings between the expert and the attorneys, whether work product was discussed or documents were provided to the expert, whether the expert was paid a fee, whether the expert was asked to agree not to discuss the case with the opposing parties or counsel, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party.

*Hewlett-Packard*, 330 F. Supp. 2d at 1093.

A confidential relationship is more likely to be found when the evidence shows that the adversary and the proposed expert had a "long term relationship" that gave the expert "a basic understanding of [the adversary's] modus operandi, patterns, of operations, decision-making process, and the like." *Id.* (quoting *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 591 (D. Minn. 1986)). Further, an expert need not have "worked directly for the objecting party" for a confidential relationship to exist between the objecting party and the expert. *See Tabaian*, 2018 WL 4566257, at *3.

"Confidential information essentially is information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.'" *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (quoting *Paul*, 123 F.R.D. at 279 (S.D. Ohio 1988) (alteration in original)). The party seeking to disqualify an expert

"should point to specific and unambiguous disclosures [of litigation-relevant confidential information] that if revealed would prejudice the party." *Id. See also Oracle Corp.*, 2012 WL 2244305, at \*7 (noting that the party seeking to disqualify an expert witness had "identified at least three examples of intellectual property that [the proposed expert witness] helped develop . . . that are the subject of [the litigation]").

An important question, about which district courts have disagreed, however, is whether confidential *technical* information is the sort of confidential information that justifies disqualifying an expert witness. Many courts have concluded that prior disclosure, not made in preparation for the then-pending litigation, of confidential technical information to a proposed expert witness does not justify disqualifying the expert, at least not when the confidential technical information is otherwise discoverable. For example, in *Sarl v. Sprint Nextel Corp.*, 2013 WL 501783 (D. Kan. Feb. 8, 2013), the court rejected the objecting party's argument that an expert witness who received confidential technical information should be disqualified. 2013 WL 501783, at \*6-7. In *Sarl*, the court offered two rationales. First, the court noted that the confidential technical information previously disclosed may be subject to discovery and therefore would be revealed anyway. *Id.* at \*6. Second, the court explained that the importance of avoiding encouraging an attorney to consult with many experts in an attempt to preclude an adversary from finding an expert favored limiting disqualification of experts for a conflict of interest to only those situations when the expert has received attorney work product or been given access to information protected by the attorney-client privilege. *Id.* at \*6-7. Similarly, other courts have examined an expert's potential conflict of interest only as it relates to the expert receiving privileged information. *See, e.g., Nikkal Indus., Ltd. v. Salton, Inc.*, 589 F. Supp. 187, 191 (S.D.N.Y. 1988).

PAGE 14 – OPINION AND ORDER

As one commentator explained:

> Most trial courts have defined confidential information as "information 'of either particular significance or . . . which can be readily identified as either attorney work product or within the scope of the attorney-client privilege.'" Under the majority view, unless the disclosed information meets this stringent standard, courts will deny a motion to disqualify an expert. Other courts have held that information that is public or that will be disseminated to the adverse party through mandatory disclosures or discovery will not constitute confidential information for the purposes of the disqualification test's second prong. *Furthermore, others have noted that communication about technical matters, as opposed to legal ones, will fall outside the purview of confidential information.*

*Vershuta*, 81 Brook. L. Rev. at 747 (footnotes omitted) (emphasis added).[4]

In the seminal case of *Paul*, the court denied a motion to disqualify, in part based on "the lack of communication of any information of either particular significance or which can be readily identified as either attorney work product or within the scope of the attorney-client privilege." *Paul*, 123 F.R.D. at 279. Further, in *Chrisjulbrian*, the court declined to disqualify an expert witness because there was "no indication that any attorney-client privileged information was ever disseminated" by the moving party or its counsel to that expert and "the factual basis

---

[4] Other courts, however, have reached a different conclusion. In *Oracle Corp.*, the district court disqualified a proposed expert witness who had consulted for the adversary because the proposed expert's consulting arrangement gave him "access to confidential information about the [relevant] technology" and the expert had "even played a role in developing it." 2012 WL 2244305, at *7. In addition, a court in this district found that "confidential technical information" may be the sort of litigation-related confidential information justifying disqualifying an expert because the expert may "be unable to segregate information obtained in the context of the confidential relationship, and opinions based on that information, from information produced in discovery." *Tabaian*, 2018 WL 4566257, at *5. The Court does not find these cases persuasive. First, direct and cross examination will likely expose when an expert obtained information from prior work versus from information produced in discovery. Second, when an expert has had no access to an opponent's privileged information or otherwise confidential work product or litigation strategies and bases an opinion on technical information that is discoverable in the later litigation, there is far less (if any) reason to exclude that expert from testifying.

upon which he based his report was discoverable under Fed. R. Civ. P. 26." 1994 WL 673440,

at *2; *see also Palmer v. Ozbek*, 144 F.R.D. 66, 68 (D. Md. 1992) (denying a motion to

disqualify a party's expert witness when the only information disclosed by the moving party to

the expert was information that is discoverable under the Federal Rules of Civil Procedure).

Another court explained that "[c]onfidential information, in the context of expert

disqualification, includes: discussion of the retaining party's strategies in the litigation, the kinds

of expert the party expected to retain, the party's views of the strengths and weaknesses of each

side, the role of each of the party's witnesses to be hired, and anticipated defenses." *U.S. ex rel.

Cherry Hill Convalescent, Ctr., Inc. v. Healthcare Rehab Sys., Inc*., 994 F. Supp. 244, 250

(D. N.J. 1997) (simplified).

Finally, courts consider many factors when assessing the fairness of and threat to the

integrity of the legal process posed by disqualifying an expert witness. "[T]he Court may ask not

only whether there is the appearance of a conflict of interest, but also 'whether another expert is

available and whether the opposing party will be unduly burdened by" disqualification. *Hewlett-

Packard*, 330 F. Supp. 2d at 1095 (quoting *United States ex rel. Cherry Hill Convalescent Ctr.,

Inc., Inc.*, 994 F. Supp. at 251). Policy concerns, particularly the need to avoid incentivizing

experts to "sell their opinions to the opposing parties or the highest bidder without concern about

the potential confidentiality of their previous consultations" and avoid encouraging attorneys to

"create relationships with numerous potential experts at a nominal fee hoping to preempt the

ability of their adversaries to obtain expert assistance," should also be considered. *Id.* (first

quoting *Pinal Creek Grp. v. Newmont Mining Corp.*, 312 F. Supp. 2d 1212, 1227 (D. Ariz. 2004)

then quoting *Stencil*, 174 F. Supp. 2d at 1083).

### 2. Application

Edwards never employed Mr. Bath. Nor does Edwards argue that its counsel ever consulted with Mr. Bath as an expert witness in this or any related litigation. Edwards does not assert that Mr. Bath ever received Edwards's attorney work product or has been given access to information protected by Edwards's attorney-client privilege. Edwards also does not contend that Mr. Bath has confidential knowledge of Edwards's strategies in this or similar litigation, the kinds of expert witnesses that Edwards expects to retain, Edwards's views of the strengths or weaknesses of each side's respective position, or Edwards's anticipated arguments and responses to HIS's arguments.

Instead, Edwards argues that based on Mr. Bath's prior work for Company X, including his positions held at that company through 2019, Mr. Bath likely would have learned about Edwards's confidential *technical* information, including many of the alleged trade secrets now at issue. Although Mr. Bath did not have any direct contractual arrangement with Edwards to maintain the confidentiality of Edwards's technical information that he learned, he did have contractual obligations of confidentiality owed to Company X and Company X appears to have had contractual obligations of confidentiality owed to Edwards. Nothing in this Opinion and Order precludes Company X from asserting its contractual rights against Mr. Bath, and nothing precludes Edwards from asserting its contractual rights against Company X. The only issue before the Court is whether to disqualify Mr. Bath from serving as HIS's expert witness in this case and, relatedly, the application of the Patent Prosecution Bar, which is discussed in the next section.

Based on Mr. Bath's contractual obligations of confidentiality owed to Company X and Company X's confidentiality obligations owed to Edwards, the Court will assume without deciding that Edwards, although indirectly, had a confidential relationship with Mr. Bath.

Edwards, however, does not identify with any specificity or detail the confidential technical information that Edwards believes Mr. Bath would have received while working for Company X that should disqualify him from serving as HIS's expert in this case. Nevertheless, the Court also will assume without deciding that Mr. Bath would have learned, at least generally, while working at Company X about some of Edwards's confidential technical information that is relevant to the current litigation.

Edwards's motion to disqualify fails, however, because the Court agrees with the many district courts that have concluded that prior disclosure, not made in preparation for the then-pending litigation, of confidential *technical* information to an expert witness does not generally justify disqualifying an expert witness when the confidential technical information is otherwise subject to discovery. *See, e.g.*, *Paul*, 123 F.R.D.at 279; *Sarl*, 2013 WL 501783, at *6-7; *see also Vershuta*, 81 Brook. L. Rev. at 747.[5] Not only is this the "majority view," *see Vershuta*, 81 Brook. L. Rev. at 747, it is the approach that best "protect[s] the integrity of the adversary process and promote[s] public confidence in the legal system." *Space Sys./Loral*, 1995 WL 686369, at *2. *Paul*'s exhortation "to balance the competing policy objectives" when determining whether confidential information is the kind that justifies disqualifying an expert—

---

[5] That is not to say that confidential technical information can *never* be the sort of confidential information that justifies disqualifying an expert witness. A party may, for example, seek to disqualify an expert witness who received confidential technical information as part of preliminary engagement with that party as a prospective expert witness in the then-pending litigation. That situation, which is not before the Court here and on which the Court expresses no position, implicates different policy concerns, such as the need to avoid incentivizing experts to "sell their opinions to the opposing parties or the highest bidder without concern about the potential confidentiality of their previous consultations" or the need to avoid incentivizing attorneys to "create relationships with numerous potential experts at a nominal fee hoping to preempt the ability of their adversaries to obtain expert assistance." *See Hewlett-Packard*, 330 F. Supp. 2d at 1095 (first quoting *Pinal Creek Grp.*, 312 F. Supp. 2d at 1227, then quoting *Stencel*, 174 F. Supp. 2d at 1083).

what later jurisdictions have fashioned as the third prong of the expert disqualification analysis—reveals why that is so. 123 F.R.D. at 282.

In the third prong, the Court focuses on its responsibility to ensure the "fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993). Here, disqualification will present some hardship for HIS because its preferred expert is Mr. Bath, based on his expertise with integrated vacuum systems gained while working at Company X. Indeed, Mr. Bath's prior work experience at Company X makes it likely that he will be able to offer information that is particularly helpful to the Court as part of the truth-seeking process in this case. In addition, the alleged trade secrets at issue focus on Edwards's vacuum system at Company X and, as Mr. Bath explains in his declaration, no one currently employed at Company X with relevant expertise is likely to be able to testify as an expert witness for HIS. Also, anyone with relevant expertise previously employed by Company X is likely to be in a similar position to Mr. Bath.

Nor does disqualification appear to be needed to promote the integrity of the legal process. Mr. Bath knows nothing about Edwards's confidential information protected under either the attorney-client privilege or work product doctrine. Neither Edwards nor its counsel shared litigation strategies or assessments with Mr. Bath. At most, Mr. Bath may have knowledge gleaned during his work at Company X about Edwards's confidential technical information that Edwards alleges are trade secrets. This technical information, however, is fully discoverable to HIS under the Federal Rules of Civil Procedure. If HIS's outside counsel and hypothetically acceptable expert witness can have access to Edwards's confidential technical information in discovery, there is nothing particularly unfair to Edwards about allowing Mr. Bath to have access to that information, despite his previous work for Company X. Thus,

PAGE 19 – OPINION AND ORDER

disqualification of Mr. Bath is unnecessary to protect the integrity of the adversary process or to promote public confidence in the legal system.[6]

Finally, Mr. Bath is not a competitor of Edwards and does not currently work for a competitor of Edwards. Indeed, Mr. Bath currently works for NASA. Aside from the patent prosecution issue raised by Edwards, which will be discussed next, Mr. Bath is unlikely to be in any position in the future in which he could improperly use any of Edwards's confidential technical information that he may learn while working as HIS's expert witness in this case. Thus, the safeguards provided under the general provisions of the Protective Order that prohibit any use of confidential or highly confidential information learned in this case outside of this lawsuit will be sufficient to protect Edwards's legitimate interests.

**B. Edwards's Motion to Enforce Patent Prosecution Bar**

The Protective Order includes a Patent Prosecution Bar that prohibits any person from receiving OAEO discovery material or information if that person is involved in the prosecution of a patent in a related field. Edwards argues that Mr. Bath is "inextricably involved" in the prosecution of Company X's Patent Application in the field of vacuum pump systems through his being named as an inventor on that application. Edwards adds that, because of Mr. Bath's continuing contractual obligations to Company X, in addition to statutory and regulatory duties imposed on named inventors while their patent applications remain pending, Mr. Bath is "unavoidably involved in the prosecution of this pending patent application." Thus, concludes

---

[6] Edwards argues that this case "is almost exactly like *Tabaian v. Intel Corp.*," a trade secret case decided by another judge in this district. The Court does not see these two cases as almost exactly alike, but to the extent they are factually similar, the Court does not find persuasive the application in that case of the third prong of the three-factor test. *See* n.4 and related text, *supra*.

Edwards, the Court should enforce the Patent Prosecution Bar by ordering HIS not to share with Mr. Bath any of Edwards's OAEO information.

### 1. Standards

Courts in the Ninth Circuit and elsewhere have used "patent prosecution bars" to prevent misuse of confidential technical information disclosed in litigation in subsequent patent prosecution activities. *See, e.g.*, *Torrey Pines Logic, Inc. v. Gunwerks, LLC*, 2020 WL 6106819, at *4-5 (S.D. Cal. Aug. 25, 2020) (enforcing patent prosecution bar). Further, patent law allow an inventor to revise or draft patent claims over a long time, including by filing "child" applications, known as "continuation" or "continuation-in-part" applications, which allow the inventor to claim priority back to the original patent application date. *See Kingsdown Med. Consultants, Ltd. v. Hollister, Inc*., 863 F.2d 867, 874 (Fed. Cir. 1988); *see also Ricoh Co., Ltd. v. Nashua Corp*., 185 F.3d 884, *3 n.3 (Fed. Cir. 1999) (unpublished) (noting the use of "continuation applications to claim previously disclosed but unclaimed features of an invention many years after the filing of the original patent application.").

In addition, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent] Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a). "[I]nformation is material to patentability when it . . . establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim." 37 C.F.R. § 1.56(b)(1). The obligation applies to "each inventor named in the application." 37 C.F.R. § 1.56(c)(1). This disclosure obligation could, in theory, even include confidential technical information received in litigation under a protective order, if that information bears on the patentability of the recipient's pending patent application. *See, e.g.*, *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc*., 139 S. Ct. 628, 633 (2019)

(discussing non-public sales of technologies claimed in a patent constitute prior art); 37 C.F.R.

§ 1.56 (noting that prior art is material to patentability).

Finally, a party seeking to enforce a patent prosecution bar "bears the burden of establishing good cause for its issuance." *Accordant Energy, LLC v. Vexor Tech., Inc.*, 2017 WL 10858845, at *2 (N.D. Ohio Oct. 3, 2017) (citing *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010)). Further, as with any protective order, a party seeking to enforce a patent prosecution bar may not rely on "vague and speculative" assertions. *Helferich Patent Licensing, LLC v. Suns Legacy Partners, LLC*, 2012 WL 6049746, at *3 (D. Ariz. Dec. 5, 2012). Rather, "a party seeking a prosecution bar 'must present a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" *Id.* (quoting *AmTab Mfg. Corp. v. SICO Inc.*, 2012 WL 195027, at *2 (N.D. Ill. Jan. 19, 2012)). To justify enforcing a prosecution bar, "the moving party must identify 'specific information that would cause it injury if disclosed.'" *Id.* (quoting *AmTab*, 2012 WL 195027, at *2).

### 2. Application

HIS argues both that Edwards did not provide the required specific information to enforce the Patent Prosecution Bar and that the Patent Application that Edwards identifies in its motion does not pertain in any material way to vacuum pump systems, let alone to any of Edwards's asserted trade secrets. According to HIS, Mr. Bath's "duty of candor and good faith in dealing with the" Patent Office covers only information known to Mr. Bath that is "material to patentability." *See* 37 C.F.R. § 1.56(a). HIS asserts that the invention disclosed in the Patent Application pertains to various embodiments of interface plates and interface vessels, and although the Patent Application mentions in passing that those interfaces may be used in connection with vacuum pumps, the Patent Application itself does not relate to vacuum pumps or vacuum pump technology. Thus, according to HIS, there are compelling reasons to believe that

Edwards's trade secret list and other OAEO information will not reveal any information that triggers any disclosure obligation by Mr. Bath.

HIS also argues that, as Edwards contends, Mr. Bath already is aware of the substance of Edwards's trade secret list. Thus, if any of its information were material to the pending Patent Application, Mr. Bath would already know it and would have already needed to disclose it. In the almost two years since Mr. Bath has left Company X, that entity has never asked him for assistance with the Patent Application. From this, HIS argues that the theoretical possibility that Company X might later do so is not a sufficient ground to bar Mr. Bath from receiving Edwards's OAEO information during his work as an expert witness for HIS in this case.

The Patent Prosecution Bar in the Protective Order is designed to protect the parties to that order. Edwards has a right to that protection, but to no more. HIS expressly, and Mr. Bath implicitly, contend that Mr. Bath will be able fully to comply with the terms of the Patent Prosecution Bar if the Court allows him access as HIS's expert witness to Edwards's OAEO information. Under the express terms of the Patent Prosecution Bar, if Mr. Bath receives access to any of Edwards's OAEO information based on his work, Mr. Bath "shall not be involved in the prosecution of patents or patent applications pertaining to vacuum pumps or vacuum pump systems before any foreign or domestic agency, including the [Patent Office]." Protective Order, ¶ 8 (ECF 14). Thus, to protect Edwards's legitimate interests, the Court orders that, if Mr. Bath receives any OAEO information produced by Edwards in discovery in this lawsuit, Mr. Bath must not be involved in any future prosecution of patents or patent applications pertaining to vacuum pumps or vacuum pump systems before any foreign or domestic agency, including the Patent Office, without prior express leave of this Court, until two years after final termination of this action, including any appeal. As with any Court order, a material violation can be punishable

by contempt. Thus, if Mr. Bath is confident that his work as an expert for HIS can be performed in full compliance with this Opinion and Order, he may do so, and the Court will not prospectively bar him from serving in that capacity.

**CONCLUSION**

The Court largely denies but grants in part Plaintiff Edwards Vacuum LLC's Motion to Disqualify Proposed Expert Roopinderjit Bath and to Enforce Patent Prosecution Bar of Interim Protective Order (ECF 51). Mr. Bath may participate as an expert witness for HIS, and he may have access to all OAEO information produced in discovery, but strictly subject to the terms stated in the Protective Order as applied in this Opinion and Order.

**IT IS SO ORDERED.**

DATED this 15th day of December, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge