# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **EDWARDS VACUUM, LLC**, | Case No. 3:20-cv-1681-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **HOFFMAN INSTRUMENTATION SUPPLY, INC. d/b/a/ HIS INNOVATIONS GROUP, MARK ROMEO, JEFFREY SCHWAB, JOSHUA RATCHFORD, ELISHA LEVETON, JOHN CHADBOURNE,** and **ANDREW ENSELEIT**, | |
| Defendants. | |

Nicholas F. Aldrich, Jr., Scott D. Eads, and Jason A. Wrubleski, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; John D. Vandenberg, KLARQUIST SPARKMAN LLP, One World Trade Center, 121 SW Salmon Street, Suite 1600, Portland, OR 97204; and Justin W. Bernick, HOGAN LOVELLS US LLP, 555 13th Street NW, Washington, DC 20004. Of Attorneys for Plaintiff.

David H. Angeli, Joanna T. Perini-Abbott, Edward A. Piper, and Michelle Holman Kerin, ANGELI LAW GROUP LLC, 121 SW Morrison Street, Suite 400, Portland, OR 97204; and Michael E. Haglund and Eric J. Brickenstein, HAGLUND KELLEY LLP, 200 SW Market Street, Suite 1777, Portland, OR 97201. Of Attorneys for Defendant Hoffman Instrumentation Supply, Inc.

Jeff S. Pitzer and Peter M. Grabiel, PITZER LAW, 210 SW Morrison Street, Suite 600, Portland, OR 97204. Of Attorneys for Defendants Mark Romeo, Jeffrey Schwab, Joshua Ratchford, Elisha Leveton, John Chadbourne, and Andrew Enseleit.

**Michael H. Simon, District Judge.**

Plaintiff Edwards Vacuum, LLC (Edwards) brings this lawsuit against Hoffman Instrumentation Supply, Inc., doing business as HIS Innovations Group (HIS), and six individual employees of HIS formerly employed by Edwards (the Individual Defendants). Edwards designs integrated vacuum pump systems mostly for computer chip manufacturers. HIS supplies parts to Edwards but recently began competing with Edwards by designing, making, and selling its own integrated vacuum pump systems. Edwards alleges misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Oregon Uniform Trade Secrets Act, Or. Rev. Stat. § 646.461; breach of contract; tortious interference with economic relations, conversion, breach of the duty of loyalty, and unjust enrichment.

Before the Court is Edwards's Motion for Preliminary Injunction. ECF 41. Although Edwards asserts many claims related to several components of its vacuum pump systems, Edwards's motion for preliminary injunction involves only allegations of breach of contract and seeks to enjoin HIS from using only one component—a bellows, specifically a bellows that resembles Edwards's custom-designed '541 Bellows. Edwards contends that the three subassemblies that HIS uses to make its materially identical bellows for HIS's integrated vacuum pump systems are the same three subassemblies that HIS, under contract with Edwards, developed and manufactured for Edwards, resulting in the '541 Bellows. Edwards argues that by making and selling materially identical bellows in competition with Edwards's '541 Bellows, HIS has violated and is continuing to violate both the Standard Terms of Purchase (Terms and Conditions) associated with Edward's purchase of the '541 Bellows from HIS and the One-Way Confidentiality Agreement (the NDA) that HIS entered into with Edwards.

As explained more fully below, the Court finds that Edwards is likely to succeed on the merits of its breach of contract claim against HIS. The Court also finds that Edwards has demonstrated a likelihood of irreparable harm absent an order enjoining HIS from making, selling, offering to sell, shipping, or otherwise using bellows that use each of the same three subassemblies as, or sharing each of three distinctive characteristics with, the '541 Bellows. Finally, the Court finds that the balance of the equities and public interest favor entering an appropriate preliminary injunction. Accordingly, the Court grants in part Edwards's motion for preliminary injunction.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, rather than its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious

questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and

the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

## BACKGROUND

### A. The Parties

Edwards designs, manufactures, and sells highly specialized vacuum pumps and related

equipment used in the field of semiconductor, or computer chip, manufacturing. These pumps

are used to evacuate air and other gases from vacuum chambers during the manufacture of

semiconductors. In a typical semiconductor manufacturing facility, process tools (including

robots) perform various tasks in chambers maintained under vacuum pressure. Vacuum pumps

are used to maintain that vacuum pressure and evacuate byproducts from the chambers. In

addition, these vacuum pumps connect to the process tools through complex piping systems. The

requirements for semiconductor manufacturing are stringent, and the vacuum pumps tie into

multiple complex systems within a manufacturing facility that sometimes employ thousands of

specialized vacuum pumps to support the semiconductor manufacturing processes. The pumps,

each suited to the unique and exacting requirements of the specific manufacturing processes they

support, can cost up to $40,000 per unit. At least 20 years ago, Edwards began to develop an

integrated vacuum pump system called "SynErgis" to support a key customer engaged in

semiconductor manufacturing. For purposes of this litigation, the parties have agreed to call this

customer, "Customer X." In 2019, Edwards earned $90 million in revenue from the sale of the

SynErgis System to Customer X. *See* ECF 42 at 8.

HIS is one of Edwards's suppliers for proprietary parts for the SynErgis System. HIS is a

local equipment supplier that makes pipes, valves, and other mechanical components. Because

HIS has been a preferred parts supplier for Customer X, Customer X's contractors often

purchase parts from HIS. Hearing Tr. at 120. As part of HIS's relationship with Edwards,

Edwards provided HIS with substantial confidential information, including diagrams and details of dozens of specific, custom-specified parts used in Edwards's integrated systems and descriptions of how those parts were used.

In 2019, Mark Romeo, an Edwards engineer who worked on the SynErgis system, left Edwards and took a position as President and Chief Innovation Officer at HIS. In the months that followed, at least a dozen other Edwards employees left Edwards to join HIS. Within about a year after the departure of these employees, HIS had designed, developed, and manufactured an integrated system that directly competes with Edwards's SynErgis System. That system, which HIS calls the Liberty Frame System, is in the process of being "qualified" at Company X.[1] After that qualification process has been completed, HIS may be able to deploy hundreds or even thousands of these systems at Company X's manufacturing facilities in Oregon and throughout the world. HIS projects that its annual revenues from sales of the Liberty Frame System to Customer X will be $90 million in 2024. *See* Hearing Ex. 27.

**B. Procedural History**

Edwards filed its complaint on September 29, 2020 and moved for a preliminary injunction on November 16, 2020. Initially, Edwards sought to enjoin HIS from making, selling, offering to sell, shipping, or otherwise using any product containing Edwards's asserted trade secrets. After limited discovery relating to Edwards's motion, on February 12, 2021, Edwards informed HIS and the Court that Edwards was narrowing the scope of its preliminary injunction motion to allege only a breach of contract claim against HIS arising from what Edwards alleged was HIS's unauthorized use of Edwards's custom-designed '541 Bellows.

---

[1] The parties are well-aware of the identity of Company X. The Court, however, intends to issue a separate Order under seal specifically identifying that company.

On March 29-31, 2021, the Court held an evidentiary hearing on Edwards's motion for preliminary injunction. The parties submitted documentary evidence and deposition transcripts. The Court also heard testimony from HIS's Director of Business Development John Gianotti, HIS's Director of Operations Andrew Saack, HIS's President and Chief Innovation Officer Mark Romeo, HIS's Director of Engineering Jeff Schwab, and HIS's retained expert witness Roopinderjit S. Bath. Mr. Romeo and Mr. Schwab are former employees of Edwards; they also are individual defendants in this litigation. Mr. Bath is a former employee of Company X.

## C. Relevant Facts

In its motion, Edwards contends that HIS breached its contractual obligations owed to Edwards relating to one of the custom-designed bellows made by HIS for Edwards for use in Edwards's SynErgis System. Edwards's SynErgis System combines an array of vacuum pumps into a single chassis with discrete connections to various systems, with the vacuum pumps and supporting components "stacked" to optimize the equipment's "footprint" in "valuable" facility space. For example, the SynErgis System provides minimal points of connection to and from the semiconductor fabrication tool, as well as many other facility systems like nitrogen, process chilled water, electricity, and exhaust piping, distributing those utilities to all vacuum pumps in a single chassis. It also uses a central computer to monitor and control the integrated system and each of the discrete vacuum pumps. That computer also ties into the various monitoring and safety systems within the manufacturing facility.

The system includes, among other components, several vacuum pumps connected to the semiconductor fabrication facility through tubing (called "forelines"). Between the forelines and vacuum pumps are gate valves. Gate valves can act as a seal on the forelines, maintaining vacuum pressure in the forelines if the vacuum pump is disconnected. Finally, there are bellows, which connect different components of the system.

A bellows is a thin, cylindrical piece of stainless steel with hydraulically formed convolutions. Hearing Tr. at 129. Bellows are flexible. The function of a bellows includes: (1) creating flexibility that allows for the system's rigid tubing to expand and contract with temperature changes; (2) absorbing vibrations from the vacuum pump before the vibrations reach the tubing; and (3) and compensating for any misalignment between the pump and the tubing. Hearing Tr. at 125-126.

Bellows are fitted with flanges. Flanges are circular pieces of stainless steel that vary in diameter and have a circular opening that allow the flanges to connect to tubing. *See* Hearing Tr. at 131. The diameter of the flanges is measured in millimeters, though flange sizes are often referred to as "ISO," followed by a number representing the diameter of the flange in millimeters, *e.g*., ISO 250.[2] *Id.* When the bottom flange and top flange of a bellows are different sizes, the bellows is called an "adapting bellows." Hearing Tr. at 197.

In 2015, Edwards redesigned its SynErgis System to place the bellows beneath the gate valve.[3] Moving the bellows below the gate valve is advantageous because it allows for the pump to be removed for maintenance or replacement with less disturbance to the forelines. *See* Hearing Tr. at 302-304. Edwards's redesigned system included custom-made bellows, which Edwards asked HIS to manufacture for Edwards.

---

[2] "ISO" refers to "International Standards Organization." Hearing Tr. at 131.

[3] The parties dispute whether Edwards or Customer X was the first to decide to move the bellows below the gate valve. Among those who testified that moving the bellows below the gate valve was Customer X's idea, there was a lack of clarity about *when* Customer X communicated to contractors that the bellows should be placed below the gate valve. *Compare* Hearing Tr. at 305-306 (estimating that Customer X communicated that requirement in 2008 or 2010) *with* Hearing Tr. at 420-421 (noting that Customer X requested the change around 2005 but the change was not implemented until 2015). The Court need not resolve this issued to decide the pending motion.

At least two contractual agreements govern HIS's work for Edwards. First, HIS agreed to an NDA with Edwards in 2015. Hearing Ex. 10. Section 2.1 of the NDA provides that "[i]n consideration of [Edwards] supplying the Information to [HIS], [HIS] agrees that all Information which it receives (or has received prior to signing this Agreement) will be treated as strictly confidential." *Id.* at 1. The NDA defines "Information" as "all marketing, commercial, financial, technical and other information, and all specifications, know-how and data, in any form or media, and whether oral or written, disclosed by or on behalf of [Edwards] to [HIS] or [HIS's] agents at any time for or in anticipation of the Purpose or in the course of discussions about the Purpose." *Id.* The NDA defines the "Purpose" as "the evaluation to be carried out by [HIS] relating to Edwards Vacuum, Inc. drawings." *Id.* Section 2.2 of the NDA excludes the following from the coverage of the NDA's confidentiality provision:

> [A]ny information which:
>
> 2.2.1   is by reasonable proof in the possession of [HIS] at the time of receipt of the information; or
>
> 2.2.2   is or becomes public knowledge other than by default on the part of [HIS] or its officers, employees or professional advisers; or
>
> 2.2.3   is lawfully obtained by [HIS] from a third party having no duty of confidentiality in respect of the information.

*Id. at 1-2.*

Second, each purchase order that Edwards sent to HIS included an attachment titled, "Standard Terms of Purchase" (the Terms and Conditions).[4] The Terms and Conditions

---

[4] An Edwards employee testified during deposition that Edwards routinely attached its Terms and Conditions to purchase orders. Hearing Ex. 59 at 11. Edwards also submitted the instruction manual that it provides employees who send purchase orders. *See* Hearing Ex. 61.

constitute a contract between Edwards and "the company or person to whom a Purchase Order is addressed" if that customer or person accepts the Purchase Order. Hearing Ex. 32 at 1. "Any written (including electronic) or oral acceptance, or commencement of the supply of Goods or performance of the Services" constitutes acceptance. *Id.* The Terms and Conditions apply "to the exclusion of any other terms on which any quotations ha[ve] been given to Edwards or subject to which a Purchase Order is accepted or purported to be accepted by the Supplier." *Id.* Delaware law governs this agreement. Hearing Ex. 32 at 4.

The Terms and Conditions include a section titled "Intellectual Property and Confidentiality." *Id.* at 3. That section provides:

> 8.1     All intellectual property rights including patents, trade marks, service marks, design rights (whether registered or unregistered), copyright (including any future copyright) and any application for any of the foregoing, arising from work conducted or prepared by the Supplier for Edwards or in tooling supplied by or on behalf of or funded by Edwards shall belong to Edwards.

> 8.2     Ownership rights in all goods and materials (including, without limitation, photographs, drawings, illustrations, film negatives, positives, bromides, recordings, proofs, physical embodiments of computer programmes, tools/tooling and dies) supplied to the Supplier by or on behalf of Edwards, or prepared, manufactured or procured by the Supplier specifically for or in connection with the performance of the Contract for Edwards shall belong Edwards and shall immediately upon Edwards'[s] request be handed over to Edwards free of charge and in good condition and no such goods or materials shall be used by Supplier other than in the performance of the Contract or disposed of without the prior written consent of Edwards.

> 8.3     All information and documents provided to the Supplier by Edwards, or otherwise acquired by the Supplier relating to Edwards' business, or created or produced by or on behalf

---

The instructions contained in that manual direct Edwards's employees to "[a]ttach Terms and Conditions file to ALL orders." *Id.* at 12.

of the Supplier specifically for or in connection with the performance of the Contract for Edwards shall be kept confidential by the Supplier and shall not be used or caused to be used by the Supplier other than for the purpose of the Contract without first obtaining Edwards' express consent in writing.

\*      \*      \*

8.5    The provisions of Condition 8.3 above shall not apply to any information or document in the public domain or coming into the public domain other than through the default of the Supplier.

*Id.*

In June 2017, Edwards began designing what would become the '541 Bellows. *See* Hearing Ex. 11. The '541 Bellows has an "ISO Alpha" flange on one end, an "ISO Beta" flange on the other end,[5] and an angled tube stub for a port. *Id.* The angled tube stub has a particular type of flange on the end. *Id.* Edwards completed its original design on July 27, 2017. *Id.*

On July 31, 2017, Edwards's purchasing officer Andria King requested a quote from HIS for the manufacturing of the '541 Bellows. *See* Hearing Ex. 52. An Edwards employee sent a drawing of the '541 Bellows to HIS. *Id.* at 2. The next day, Corey Hoffman, a HIS employee, supplied the requested quote and copied HIS's Mr. Saack. Hearing Ex. 53.

On August 8, 2017, Edwards placed a purchase order with HIS for six '541 Bellows. Hearing Ex. 55 at 243. The purchase order stated, in relevant part: "This order is subject to our terms and conditions of purchase attached" and instructed HIS to "confirm receipt of this order and dock dates via email within 2 business days." *Id.* at 244. Later that day, Edwards asked HIS

---

[5] Without deciding at this time whether the '541 Bellows or aspects of it, including its specific dimensions, are trade secrets, the Court will refrain from identifying the specific measurements of the '541 Bellows to protect what Edwards contends are trade secrets. The parties are well-aware of what sizes are represented when the Court refers to "ISO Alpha" and "ISO Beta," respectively.

to expedite one '541 Bellows. Hearing Ex. 54. On August 9, 2017, Mr. Saack acknowledged receipt of the purchase order and confirmed that HIS would expedite one '541 Bellows. Hearing Ex. 84. Mr. Saack signed his email acknowledging Edwards's order, "Andrew." *Id.* Mr. Saack also testified that "Andrew" was not a part of his form signature line but something that he typed himself. Hearing Tr. at 237.

HIS soon discovered that Edwards's drawing of the '541 Bellows was not manufacturable. *See* Hearing Tr. at 207. Edwards's drawing called for the bellows to be attached to the flange via straight, three-inch tubing. Hearing Tr. at 207-208; *see also* Hearing Ex. 11. That tubing, however, was smaller in diameter than the bellows itself. Hearing Tr. at 207-208. Thus, the tubing, if unmodified, would fall through the bellows. *Id.* HIS encountered similar problems with other Edwards's designs, *see* Hearing Tr. at 204, 205-207, 211, and had tried to resolve the problem by "flaring" the tube. Hearing Tr. at 206. Edwards, however, complained about flared tubing and insisted that the tubing be straight. Hearing Tr. at 201, 206.

HIS then tried a different approach; it modified stock components to create three subassemblies that, when combined, would make the '541 Bellows. First, HIS took a bellows with an "ISO Alpha" flange on both ends, a component that HIS kept stocked, and removed one of the flanges, leaving an "ISO Alpha" flange on one end and a flange-less straight cuff on the other end. Hearing Tr. at 207-208, *see* Hearing Ex. 282. HIS then took an "ISO Beta" flange—another stock component—and custom bore an opening that would fit over the flange-less "ISO Alpha" cuff. Hearing Tr. at 208, *see* Hearing Ex. 284. Finally, HIS took a straight small diameter, three-quarters inch tube stub and bent it to make an angled tube stub. Hearing Tr. at 214-215. Although each of the components that HIS used to make the '541 Bellows were components that HIS regularly stocked, HIS modified these pieces to complete Edwards's

purchase order for the '541 Bellows. Hearing Tr. at 208; *see also* Hearing Tr. at 242 ("This is the first time that we have a record of [removing] a flange off of this part.").

HIS later began to custom order these components, effectively outsourcing the labor of modifying the standard components. *See* Hearing Tr. at 240. Thus, rather than remove the flange from the "ISO Alpha" by "ISO Alpha" flange, HIS ordered a part where the flange on one side was already removed. HIS named this part "Subassembly 1."[6] Hearing Tr. at 239-240. Order history for Subassembly 1 reveals that HIS first ordered this part on September 25, 2017, a little more than six weeks after Edwards first ordered the '541 Bellows. Hearing Tr. at 241, Hearing Ex. 222; *see also* Hearing Tr. at 456. Similarly, HIS ordered an "ISO Beta" flange with an opening bored to fit the flange-less "ISO Alpha" cuff. Hearing Tr. at 248-249. HIS called this part Subassembly 2. *Id.* There was conflicting testimony about whether HIS made or ordered this component before HIS made Edwards's '541 Bellows.[7] Finally, HIS ordered a three-quarters inch small diameter tube stub that was pre-bent. HIS called that part Subassembly 3. Hearing Tr. at 249. Mr. Saack was unaware of HIS having manufactured or ordered this part before HIS began making Edwards's '541 Bellows. Hearing Tr. at 239.

---

[6] "Subassembly 1," "Subassembly 2," and "Subassembly 3," are pseudonyms. Because HIS's part names would reveal the specific measurements of the '541 Bellows, the Court declines to use HIS's actual part names. *See supra* n.4. The parties are well aware of the actual part names for Subassembly 1, Subassembly 2, and Subassembly 3.

[7] Mr. Saack testified that he was unaware of any instance of HIS making this subassembly before HIS made the '541 Bellows. Hearing Tr. at 243-244. Mr. Schwab, however, testified that he was told by an HIS employee that HIS made the subassembly many times before HIS began work on Edwards's '541 Bellows. Hearing Tr. at 425. Mr. Schwab testified that he briefly viewed a manufacturing history of the part revealing that HIS first manufactured the part in February 2009. *Id.* The Court, however, did not resolve this dispute for purposes of the pending motion.

In 2019, LVL3, a private equity company located in Portland, Oregon, acquired HIS. Hearing Tr. at 163. After several employees of Edwards left to join HIS, s*ee, e.g.*, Hearing Tr. at 267, HIS began work on its own integrated vacuum pump system, which became the Liberty Frame System. In December 2019, Andrew Enseleit, a former Edwards employee now working for HIS, produced a drawing of a bellows design for the Liberty Frame System. Hearing Tr. at 432, Hearing Ex. 25-A; *see also* Hearing Ex. 25. To the frustration of Mr. Enseleit's supervisors at HIS, however, the bellows depicted in the drawing was labor-intensive and expensive to manufacture. Hearing Ex. 2 at 65. Thus, in March 2020, Mr. Saack instructed Mr. Enseleit to "use stock components that [HIS] ha[s] on the shelf" to design the bellows. Hearing Ex. 3 at 98. On March 16, 2020, Mr. Enseleit asked Mr. Saack for the name of the part used in "the flange bellows" subassembly of "[t]he integrated bellow ISO [Alpha] X ISO [Beta] for Edwards with the port." Hearing Ex. 26. Mr. Saack replied, "[Subassembly 1]." *Id.* Mr. Saack added that Enseleit should use Subassembly 3 to design the bellows' tube stub. *Id.* Mr. Saack even brought Subassembly 3 to Enseleit. *Id.*

Four days later, a designer at HIS produced a drawing of a tube stub resembling the tube stub on the '541 Bellows. *See* Hearing Ex. 23. By April 15, 2020, HIS's designers had completed a drawing of the bellows for the Liberty Frame System, and HIS assigned the bellows HIS part number H50322-000. Hearing Ex. 24. The bill of materials called for three subassemblies: Subassembly 1, Subassembly 2, and Subassembly 3. *Id.* These are the same subassemblies that HIS uses to make the Edwards '541 Bellows. The H50322-000 Bellows appears in drawings of HIS's Liberty Frame System. Hearing Tr. at 438-439; *see also* Hearing Ex. 28, Hearing Ex. 29, Hearing Ex. 30. HIS has sold the Liberty Frame System to Customer X and other customers. *See* Hearing Tr. at 162.

HIS also has sold the H50322-000 Bellows as a standalone part. For example, just a few days after Edwards informed the Court that its preliminary injunction motion would concern only the '541 Bellows, BCT, an Israeli contractor for Customer X, asked HIS to supply several bellows with specifications that so closely matched that of the '541 Bellows that at least one HIS employee speculated—correctly, it would appear—that BCT was modifying an Edward's system. Hearing Tr. at 357. HIS sent BCT drawings of the H50322-000 Bellows. Hearing Tr. at 120; Hearing Tr. at 378-379. HIS later supplied BCT with the 18 H50322-000 Bellows. Hearing Tr. at 380-381. HIS continues to make '541 Bellow for Edwards's use in the Synergis System that Edwards continues to sell to Customer X. *See* Hearing Tr. at 105.

## DISCUSSION

Edwards's motion for preliminary injunction is premised on what Edwards contends is HIS's breach of three contractual provisions found in two agreements between Edwards and HIS. Edwards alleges that HIS breached § 2.1 of the NDA, § 8.2 of the Terms and Conditions, and § 8.3 of the Terms and Conditions. Because the Court finds that Edwards is entitled to a preliminary injunction to remedy HIS's breach of § 8.2 of the Terms and Conditions, the Court declines to address Edwards's assertions that HIS also breached § 8.3 of the Terms and Conditions and § 2.1 of the NDA. Accordingly, the discussion that follows, focuses on § 8.2 of the Terms and Conditions.

### 1. Likelihood of Success on the Merits

Edwards is likely to succeed on the merits of its claim that HIS breached § 8.2 of the Terms and Conditions. The Terms and Conditions provide—and the parties agree—that Delaware law applies. To establish a breach of contract under Delaware law, Edwards must show that a contractual obligation existed between it and HIS, that HIS breached that obligation, and

that Edwards was harmed by that breach. *See Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005).

### a. Existence of Contractual Obligation

The Terms and Condition constitute a contractual obligation between HIS and Edwards. The Terms and Conditions provide that "[a] Contract shall be formed on acceptance of the Purchase Order by the Supplier" and specify that "written (including electronic) or oral acceptance," and "commencement of the supply of Goods or performance of the Services" constitutes acceptance. Hearing Ex. 32 at 4. HIS both accepted the order in writing and supplied the requested goods. First, HIS sent Edwards an email acknowledging the order and promising to deliver the '541 Bellows. *See* Hearing Ex. 84 at 1. Attached to that email was HIS's order acknowledgment form. *Id.* at 2. Second, HIS performed the obligations under the purchase order. Thus, HIS accepted Edwards's offer. *See* Del Code. Ann. tit. 6, § 2-206(1)(b); *see also Harwire, LLC v. Zero Int'l, Inc.*, 2014 WL 5144610, at *11 (D. Del. Oct. 14, 2014) (finding a purchase order and standard terms and conditions attached to a purchase order constituted a contract when the seller performed the contract, even though the seller did not read the standard terms and conditions and intended to "reject" the terms.)

HIS argues that the purchase order is unenforceable because it violates the statute of frauds. At the outset, HIS cites the wrong statute of frauds. HIS cites Delaware Code Title 6, § 2714(1)(a). Delaware, however, has adopted the Uniform Commercial Code (UCC). *See Rottner v. AVG Tech. USA, Inc.*, 943 F. Supp. 2d 222, 230 (D. Mass. 2013) ("Delaware . . . ha[s] adopted the UCC . . . ."). The Delaware UCC statute of frauds is codified at Delaware Code Title 6, § 2-201. That provision states that "a contract for the sale of goods for the price of $500 or more" is enforceable only if "there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is

sought." Del. Code Ann. tit. 6, § 2-201(1). In Delaware, "[i]f a law requires a signature, an electronic signature satisfies the law." Del. Code Ann. tit. 6, § 12A-107(d). Mr. Saack testified that he electronically signed an email acknowledging the purchase order. Hearing Tr. at 237. Thus, Mr. Saack provided the necessary signature. Moreover, the Delaware UCC provides that an otherwise valid contract that does not satisfy requirements of § 2-201(1) is still enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted." *Id.* § 2-201(3)(c). The parties agree that HIS fulfilled the purchase orders for the '541 Bellows and accepted payment for those orders. HIS's argument that the Terms and Conditions fail under the statute of frauds is meritless.

### b. Breach of Contractual Obligation

HIS breached the Terms and Conditions. Under Delaware law, "[t]he proper construction of any contract . . . is purely a question of law." *Rhone–Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). When a court interprets a contract, "the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous. Ambiguity does not exist simply because the parties disagree about what the contract means." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) (footnotes omitted). Additionally, "[a] term is not ambiguous simply because it is not defined." *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 468 n. 86 (Del. Ch. 2008). Ambiguity exists "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc*, 616 A.2d at 1196. If a contract is not ambiguous, a court should "give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

Section 8.2 provides:

> *Ownership rights in all goods and materials* (including, without
> limitation, photographs, drawings, illustrations, film negatives,
> positives, bromides, recordings, proofs, physical embodiments of
> computer programmes, tools/tooling and dies) supplied to the
> Supplier by or on behalf of Edwards, *or prepared, manufactured
> or procured by the Supplier specifically for or in connection with
> the performance of the Contract for Edwards shall belong
> Edwards* and shall immediately upon Edwards'[s] request be
> handed over to Edwards free of charge and in good condition *and
> no such goods or materials shall be used by Supplier other than in
> the performance of the Contract* or disposed of without the prior
> written consent of Edwards.

Hearing Ex. 32 at 4 (emphasis added). Section 8.2 is unambiguous.[8] HIS breached this provision

when it used the three subassemblies that HIS manufactured, and later procured, for Edwards's

'541 Bellows to make virtually identical bellows for HIS's competing Liberty Frame System and

to sell HIS's virtually identical bellows to BCT without Edwards's consent. The subassemblies

are goods or materials in that they are "tangible property that is not money." *See Goods*, Black's

Law Dictionary (4th pocket ed. 2011) ("tangible or movable personal property other than

money"). Mr. Saack testified that HIS first "manufactured" the subassemblies and later

---

[8] At the Preliminary Injunction hearing, HIS briefly argued that § 8.2 is ambiguous.
When the Court asked HIS to identify the term or terms that HIS believed were susceptible to
multiple reasonable definitions, HIS first pointed to "goods and materials." Hearing Tr. at 508.
HIS did not, however, identify multiple reasonable definitions of "goods and materials." Nor
does the Court find that those terms are ambiguous. Both are defined in Black's Law Dictionary.
*See Goods*, Black's Law Dictionary (4th pocket ed. 2011) ("tangible or movable personal
property other than money"); *Material*, Black's Law Dictionary (4th pocket ed. 2011) ("of or
relating to matter; physical"). Moreover, § 8.2 itself provides an illustrative but nonexclusive list
of examples of "goods and materials."

HIS next argued that the phrase "supplied to the supplier by or on behalf of Edwards or
prepared, manufactured, or produced by the supplier specifically for or in connection with the
performance of the contract for Edwards" is ambiguous. Hearing Tr. at 508. Again, however,
HIS did not offer an alternative interpretation of this provision. HIS's attempts to portray § 8.2 as
ambiguous reflect only that HIS and Edwards disagree about the legal implications of § 8.2.
That, however, does not render § 8.2 ambiguous. *See generally United Rentals, Inc.*, 937 A.2d
at 830.

"procured" the subassemblies from other suppliers. Most importantly, Mr. Saack testified that HIS manufactured, assembled, and later procured the subassemblies so that HIS could make Edwards's '541 Bellows pursuant to Edwards's purchase orders. The order history of Subassembly 1, and Mr. Saack's testimony about the order history of Subassembly 3, reveal that HIS did not use at least two of the subassemblies before Edwards's first purchase order for the '541 Bellows. This shows that HIS manufactured and procured these subassemblies "in connection with" Edwards's purchase orders. Finally, no one disputes that HIS did not obtain Edwards's consent before it used those same subassemblies in the bellows that HIS made for its own competing Liberty Frame System. That is precisely what § 8.2 forbids HIS from doing. Although Edwards did not contractually preclude its suppliers from generally competing with Edwards, by contract with its suppliers Edwards ensured that it did not give a head start to any supplier who wishes to compete with Edwards by using goods or materials that the supplier expressly made for Edwards.

HIS makes several arguments attempting to avoid this conclusion, but none are availing. First, HIS argues that because the Terms and Conditions are a "contract of adhesion," the text of § 8.2 must be construed against Edwards. Even assuming the Terms and Conditions were a contract of adhesion, which the Court doubts,[9] the Court may only invoke HIS's proposed rule,

---

[9] Not all standard-form contracts are contracts of adhesion. Some commentators consider the presence of unequal bargaining power to be the key feature that distinguishes a contract of adhesion from merely a standard-form contract. *See* Friedrich Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum. L. Rev. 629, 632 (1943). For further discussion of how commentators define contracts of adhesion, *see McKenzie Law Firm, P.A. v. Ruby Receptionists, Inc.*, ___ F. Supp. 3d ___, 2020 WL 6780341, at *4-5 (D. Or. Nov. 18, 2020). If unequal bargaining power is the mark of a contract of adhesion, Edwards's Terms and Conditions are not a contract of adhesion. HIS is a sophisticated party, and HIS was free to reject Edwards's purchase order. Because the Terms and Conditions are unambiguous, the Court need not determine whether the Terms and Conditions represent a contract of adhesion.

known as *contra proferentum*, if the contract were ambiguous. *See Norton v. K-Sea Trasp. Partners L.P.*, 67 A.3d 354, 365 (Del. 2013). Because Section 8.2 is unambiguous, *contra proferentum* is not appropriate in this context. *See id.*

HIS also argues that bellows resembling Edwards's '541 Bellows are readily available in the market. This argument fails for at least two reasons. First, it is irrelevant. Unlike § 2.1 of the NDA or § 8.3 of the Terms and Conditions, there are no exceptions in § 8.2 for information that is publicly available or that HIS lawfully obtained from a third party. As explained above, § 8.2 seeks not to protect trade secrets or confidential information, but to protect Edwards from having to compete with work that Edwards itself commissioned and paid. Thus, whether other suppliers offer bellows similar (or even identical) to the '541 Bellows does not affect whether HIS breached § 8.2.

Second, the evidence does not support HIS's contention that bellows closely resembling Edwards's '541 Bellows are readily available in the market. Mr. Bath and Mr. Romeo both testified that they could purchase a bellows like the '541 Bellows "off the shelf" or from a catalog. Hearing Tr. at 172, 313-314. When pressed, however, both admitted that it was not as simple as they first stated. Mr. Romeo conceded that he had "not seen [a bellows] that has a port in it with those two [flange] sizes and exactly like that." Hearing Tr. at 314-15. Similarly, Mr. Bath explained that, when he said he could order a bellows resembling the '541 Bellows from a catalog, he meant that "[t]he catalog will give [the buyer] options" that allow the buyer "to define what [the buyer] want[s] on the end." Hearing Tr. at 190-191. HIS never produced a catalog offering a bellows of approximately the same height as the '541 Bellows with an "ISO Alpha" flange on one end, an "ISO Beta" flange on the other end, and an angled tube stub for a port.

Edwards has shown that HIS likely breached § 8.2 of the Terms and Conditions. As further discussed below, Edwards also has established that HIS's likely breach likely has caused harm to Edwards and likely will continue to cause harm to Edwards. Thus, Edwards has demonstrated that it is likely to succeed on the merits of its breach of contract claim.

## 2. Irreparable Harm

Edwards argues that, absent a preliminary injunction, it will continue to suffer irreparable harm in the form of: (1) loss of its intellectual property; (2) having to contend with unfair competition from HIS in the marketplace; (3) loss of market share; and (4) damage to its relationships with customers. HIS responds that Edwards has failed to present evidence that any of these harms are likely to occur.

To obtain a preliminary injunction, a plaintiff must show a likelihood of irreparable harm if the preliminary injunction is not granted. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury") (quoting 11 Mary K. Kane, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. October 2020 update). Also, the alleged harm must be imminent. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016). A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be rendered." *Id.* at 1023. The Supreme Court, however, has directed courts not to presume that some harms are irreparable or otherwise apply categorical rules to an analysis of irreparable harm. *See Winter*, 555 U.S. at 22; *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006).

Irreparable harm can be difficult to define, but it is often marked by an inability to be adequately remedied by money damages. *See Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) (citing *Pub. Util. Comm'n v. FERC*, 814 F.2d 560, 562

(9th Cir. 1987)). Many harms associated with the unauthorized use of trade secrets or non-trade secret confidential information are difficult to quantify. *See, e.g. Adidas Am., Inc. v. Skechers USA, Inc.*, 2017 WL 2604310, at *7 (D. Or. June 12, 2017) (citing *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013)). These harms include unfair competition, *see, e.g.*, 5 McCarthy on Trademarks and Unfair Competition 30:2 ("It is difficult to imagine an unfair competition case where damages are adequate to remedy the problem of defendant's continued acts.); loss of market share, *Neurovision Medical Products, Inc. v. NuVasive, Inc.*, 2014 WL 12554861, at *1 (C.D. Cal. Aug. 5, 2014) ("[L]oss of sales is notoriously difficult to calculate, making money damages an inadequate remedy.") (quoting *Card Tech Int'l, LLLP v. Provenzano*, 2012 WL 2135357, at *25 (C.D. Cal. June 7, 2012)); and damage to reputation, goodwill, or relationships with customers, *see Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (listing damage to goodwill as "intangible").

Unsurprisingly then, courts have found irreparable harm when a plaintiff establishes that these sorts of harms were likely to occur. *See, e.g.*, *Novartis Consumer Health v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (collecting cases for the proposition that "loss of market share constitutes irreparable harm"); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.");[10] *Shippers, a Div. of Ill. Tool Works, Inc. v. Fontenot*, 2013 WL 12092056, at *6 (S.D.

_____

[10] *Stuhlbarg* was decided before *Winter* and therefore before the Supreme Court instructed lower courts that a mere possibility of irreparable harm did not entitle a plaintiff to a preliminary injunction. Courts, however, have continued to rely on *Stuhlbarg* after *Winter* when there is a likelihood of loss of prospective customers or goodwill. *See, e.g.*, *FNA Grp., Inc. v. Jiangsu Longteng-Pengda Elec. Mech. Co.*, 2020 WL 2840154, at *11 (D. Nev. May 31, 2020).

Cal. Sept. 23, 2013) ("[T]he loss of customers to a competitor is considered to be irreparable harm that justifies equitable relief.").

Edwards has shown a likelihood that it will suffer unfair competition causing a loss of market share absent an injunction. Edwards, assisted by HIS, designed Edwards's '541 Bellows to overcome a bevy of engineering challenges. For example, Mr. Romeo testified that Edwards used a proprietary computer program to arrive at the optimum size of tubing for the forelines running from the gate valve to the semiconductor fabrication facility. Hearing Tr. at 292. The bellows connects to the gate valve. Thus, the size of the forelines also determines the size of the top flange of the bellows. Hearing Tr. at 292. Thus, Edwards used its proprietary computer program to determine the size of at least one characteristic of the '541 Bellows.

The height of the bellows is also the product of design choice. Compression is an important function of bellows. A bellows somewhat taller than the '541 Bellows might be compressed to fit between the gate valve and pump. Such a bellows, however, then would have less capacity further to compress. *See* Hearing Tr. at 436.

Finally, the footprint of the frame is critical, especially to Customer X. *See* Hearing Tr. at 450. An angled tube stub allows a vacuum pump frame designer to "get as much stuff in that [footprint] as possible" by orienting vertically what would otherwise be a horizontally oriented component. When HIS used the work done by Edwards (and even done by HIS while being paid by Edwards for that work) to design HIS's competing bellows—in violation of § 8.2—HIS overcame those same engineering challenges at Edwards's expense (literally) and in a fraction of the time spent by Edwards. Now, Edwards must compete with HIS for the same key customer. That is precisely the sort of unfair competition that supports a finding of irreparable harm. *See Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710 (9th Cir. 2019) (finding plaintiff

suffered irreparable harm when a competitor saved "time and money" in developing a competing product by stealing the plaintiff's design), *cert denied* 140 S. Ct. 850 (2020); [11] *see also Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1221 (D. Idaho 2013) ("[I]rreparable harm may arise when a company loses prospective goodwill due to the lost ability to market a unique product.") (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir.1995)).

In addition, the harm posed to Edwards is not easily quantifiable. HIS is selling the Liberty Frame System to Customer X, Edwards's primary customer. Edwards argues that HIS could eliminate Edwards's business.[12] Irreparable harm may exist when a plaintiff's economic loss is so great as to threaten the existence of the plaintiff's business. *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1105 (N.D. Cal. 2017) (citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)). Even if it HIS cannot put Edwards out of business between now and trial, HIS's projections suggest that HIS intends to undermine Edwards's long-term relationship with Customer X in ways that that damages might not be able to remedy. *See Rent-A-Center, Inc.*, 944 F.2d at 603.

Further, HIS's conduct during the pendency of Edwards's motion also is evidence that HIS is likely to continue to violate § 8.2 between now and trial. HIS continues to sell the Liberty

---

[11] HIS also argues that there is no nexus between the harm that Edwards contends that it will suffer and HIS's breach. The court in *Oracle*, however, found a nexus when the defendant's conduct allowed the defendant, a competitor to the plaintiff, to save time and money in developing a competing product. 738 F. App'x at 710. HIS's breach of § 8.2 represents a similar shortcut.

[12] There is at least some evidence supporting this fear. HIS projected that, by 2024, its annual revenue from its "[Customer X] Project" would be $90 million. Hearing Ex. 27. That is the same amount of annual revenue that Edwards earned from sales of its Synergis System to Customer X in 2019. *See* ECF 42 at 8.

Frame System to Customer X. Moreover, during the pendency of this motion, and *after* Edwards narrowed the scope of this motion to focus on the '541 Bellows, HIS sold to a contractor for Customer X a bellows containing precisely the same subassemblies as used in the '541 Bellows. HIS has given the Court no reason to believe it will stop selling bellows using the same subassemblies used in the '541 Bellows between now and trial. Because Edwards has shown that it is likely to suffer immediate, severe, and intangible harm as a result of HIS's continued violation of § 8.2, the Court finds that Edwards has shown that it is likely to suffer irreparable harm absent a preliminary injunction.

### 3. Balance of Equities and Public Interest

The balance of the equities and public interest also favor Edwards. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) ("In assessing whether the plaintiff [are entitled to a preliminary injunction], the district court has a duty to balance the interests of all parties and weigh the damage to each."). The imminent, severe, and intangible harm that Edwards faces absent an injunction is described above. HIS will be burdened by a preliminary injunction in that it will be prohibited from selling bellows closely resembling the '541 Bellows and from selling any integrated vacuum pump systems containing a bellows closely resembling the '541 Bellows. As both BCT's bellows order earlier this year and Customer X's purchase of HIS's Liberty Frame System show, an injunction will deprive HIS of some sales.

The burden that an injunction will impose on HIS is less severe than the likely harm to Edwards absent an injunction for at least two reasons. First, the Court only enjoins HIS from making, selling, offering to sell, shipping, or otherwise using a bellows that has *each* of these characteristics: (1) has an "ISO Alpha" flange on one end and an "ISO Beta" flange on the other end; (2) is a similar height as the '541 Bellows; and (3) has an angled tube stub for a port; or contains *each* of the three subassemblies that HIS uses to make the '541 Bellows. That leaves

many other bellows for HIS to make and sell. HIS's witnesses testified that there is nothing innovative or unique about the '541 Bellows, *see, e.g.*, Hearing Tr. at 172, so those other bellows that HIS may still sell should suffice for HIS's legitimate needs. *See Lillge*, 2007 WL 2900568, at *7 ("[The defendant] testified that he has no use for Plaintiff's trade secrets and will therefore suffer no prejudice at all if he is enjoined from using them.").

Second, HIS's own Chief Innovation Officer, Mr. Romeo, testified that HIS could design a bellows for its Liberty Frame System that would satisfy Customer X's requirements and would not materially resemble Edwards's '541 Bellows. Hearing Tr. at 383-387. Thus, the injunction merely erects an additional engineering hurdle that HIS itself believes it can surmount. Accordingly, the balance of the equities favors Edwards. Because Edwards is likely to succeed on the merits, will likely suffer irreparable harm absent an injunction, and the balance of the equities tip in Edwards's favor, it follows that the public interest favors an injunction. *See Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1210 (E.D. Cal. 2020); *see also Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092-93 (E.D. Cal. 2012).

## CONCLUSION

Because Edwards is likely to prevail on the merits of its breach of contract claim, is likely to suffer irreparable harm, and the balance of the equities and public interest favor granting a preliminary injunction, the Court GRANTS IN PART Edwards's Motion for Preliminary Injunction (ECF 41) as follows:

## PRELIMINARY INJUNCTION

1.      HIS may not in any way, directly or indirectly, sell, make, procure, use, or assist anyone else in selling, making, or using, or procuring a bellows that is substantially similar to the '541 Bellows (meaning a bellow with all three of the following characteristics: (1) it is

roughly the same height as the '541 Bellows;[13] (2) it has an "ISO Alpha" flange on one end and an "ISO Beta" flange on the other end;[14] (3) it has an angled port (tube stub) without Edwards's prior written consent.

2.      HIS may not in any way, directly or indirectly, sell, make, procure, use, or assist anyone else in selling, making, or using, or procuring a bellows that uses all three of the following subassemblies: (1) Subassembly 1; (2) Subassembly 2; and (3) Subassembly 3; without Edward's prior written consent.[15]

3. HIS may not use or access any drawings, 3-D models, or similar information that contain or reflect part number H50322-000 without Edwards's prior written consent.

**IT IS SO ORDERED**.

DATED this 10th day of May, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[13] The parties are well-aware of the height of the '541 Bellows at issue. The Court, however, intends to issue a separate Order under seal specifically stating that dimension.

[14] The parties are well-aware of the specific dimensions at issue. The Court, however, intends to issue a separate Order under seal specifically stating the dimensions referenced in this Opinion and Order by the terms "ISO Alpha" and "ISO Beta."

[15] The parties are well-aware of the specific part numbers at issue. The Court, however, intends to issue a separate Order under seal specifically stating the part numbers referenced in this Opinion and Order by the terms "Subassembly 1," "Subassembly 2," and "Subassembly 3."