# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **EDWARDS VACUUM, LLC**, | Case No. 3:20-cv-1681-SI |
| Plaintiff, | **OPINION AND ORDER ON PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS** |
| v. | |
| **HOFFMAN INSTRUMENTATION SUPPLY, INC. d/b/a/ HIS INNOVATIONS GROUP, MARK ROMEO, JEFFREY SCHWAB, ELISHA LEVETON, JOHN CHADBOURNE,** and **ANDREW ENSELEIT**, | |
| Defendants. | |

Nicholas F. Aldrich, Jr., Scott D. Eads, and Jason A. Wrubleski, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; John D. Vandenberg, KLARQUIST SPARKMAN LLP, One World Trade Center, 121 SW Salmon Street, Suite 1600, Portland, OR 97204; and Justin W. Bernick, HOGAN LOVELLS US LLP, 555 13th Street NW, Washington, DC 20004. Of Attorneys for Plaintiff.

David H. Angeli, Joanna T. Perini-Abbott, Edward A. Piper, and Michelle Holman Kerin, ANGELI LAW GROUP LLC, 121 SW Morrison Street, Suite 400, Portland, OR 97204; and Michael E. Haglund and Eric J. Brickenstein, HAGLUND KELLEY LLP, 200 SW Market Street, Suite 1777, Portland, OR 97201. Of Attorneys for Defendant Hoffman Instrumentation Supply, Inc.

Jeff S. Pitzer and Peter M. Grabiel, PITZER LAW, 210 SW Morrison Street, Suite 600, Portland, OR 97204. Of Attorneys for Defendants Mark Romeo, Jeffrey Schwab, Elisha Leveton, John Chadbourne, and Andrew Enseleit.

**Michael H. Simon, District Judge.**

Plaintiff Edwards Vacuum, LLC (Edwards) brings this lawsuit against one of its suppliers and competitors, Hoffman Instrumentation Supply, Inc., doing business as HIS Innovations Group (HIS), and five employees of HIS who previously worked for Edwards (the Individual Defendants). Edwards designs integrated vacuum pump systems, mostly for computer (or semiconductor) chip manufacturers. HIS supplies parts to Edwards but also recently began to compete with Edwards by designing, making, and selling its own integrated vacuum pump systems. In its Second Amended Complaint, Edwards alleges misappropriation of trade secrets, breach of contract, tortious interference with economic relations, conversion, breach of the duty of loyalty, and unjust enrichment. HIS denies liability. HIS also asserts three counterclaims, alleging breach of contract, monopolization, and attempted monopolization. Before the Court is Edwards's motion to dismiss HIS's counterclaims under Rule 12(b)(6) of the Federal Rules of Civil Procedure and alternative motion to dismiss under the doctrine of forum *non conveniens*. For the reasons stated below, the Court grants in part and denies in part Edwards's motions to dismiss. The Court also bifurcates HIS's antitrust counterclaims and stays any discovery that is related only to HIS's antitrust counterclaims. HIS's breach of contract counterclaim may proceed.

<strong>STANDARDS[1]</strong>

**A. Motion to Dismiss for Failure to State a Claim**

A motion to dismiss under Rule 12(b)(6) may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual

---

[1] The same standards that apply to a defendant's motion to dismiss a claim asserted by a plaintiff also generally apply to a plaintiff's (and counterclaim defendant's) motion to dismiss a

allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "[T]o be entitled to a presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted

---

counterclaim asserted by a defendant (and counterclaim plaintiff). *See Unigestion Holding, S.A. v. UPM Tech., Inc.*, 2016 WL 4033976, at *2 (D. Or. July 26, 2016).

unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

**B.  Motion to Dismiss for Forum *Non Conveniens***

> **1.  Forum *Non Conveniens* Based on a Contractual Forum-Selection Clause**

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum *non conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 60 (2013). The doctrine of forum *non conveniens* "rests on the principle that a court may resist imposition upon its jurisdiction when the matter may be more conveniently tried in another forum, even when jurisdiction is authorized by the letter of a general venue statute." *Hamilton v. Firestone Tire & Rubber Co.*, 679 F.2d 143, 146 (9th Cir. 1982) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)). The Ninth Circuit has cautioned, however, that "[t]he doctrine of forum *non conveniens* is a drastic exercise of the court's 'inherent power' because, unlike a mere transfer of venue, it results in the dismissal of the plaintiff's case. . . . Therefore, we have treated forum *non conveniens* as 'an exceptional tool to be employed sparingly,' and not a 'doctrine that compels plaintiffs to choose the optimal forum for their claim.'" *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002)).

When parties to a lawsuit have formed a contract that includes a valid forum-selection clause, federal law controls whether that clause is enforceable. *See Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 513 (9th Cir. 1988). In *Atlantic Marine*, the Supreme Court clarified the factors that a district court should consider when evaluating the enforceability of a valid forum-selection clause. 571 U.S. at 63-65. When a valid forum-selection clause is present, "the plaintiff's choice of forum merits no weight." *Id.* at 63. Additionally, the district court "should not consider arguments about the parties' private interests. . . . A court accordingly must deem

the private-interest factors [including inconvenience to the parties] to weigh entirely in favor of the preselected forum." *Id*. at 582. A district court may only consider arguments concerning public-interest factors, which "will rarely defeat" a motion to dismiss. *Id*.

The Supreme Court also explained that a valid forum-selection clause alters the ordinary forum *non conveniens* analysis. *See Atl. Marine*, 571 U.S. at 63. A court must give a valid forum-selection clause "controlling weight in all but the most exceptional cases." *Id*. at 60 (citation and quotation marks omitted). Courts should not "unnecessarily disrupt the parties' settled expectations" when the parties have "contracted in advance to litigate disputes in a particular forum." *Id*. at 66. "In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain." *Id*.; *see also Swenson v. T-Mobile USA, Inc*., 415 F. Supp. 2d 1101, 1104 (S.D. Cal. 2006) ("[Forum selection clauses] are prima facie valid and are enforceable unless the party challenging enforcement shows the clause is unreasonable under the circumstances." (citing *R.A. Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 325 (9th Cir. 1996))). A party asserting a claim subject to a valid forum-selection clause pointing to another forum bears the burden of showing exceptional circumstances that make dismissal inappropriate despite that clause. *See Atl. Marine*, 571 U.S. at 63.

### 2.  **Common Law Forum** *Non Conveniens*

In the absence of a valid forum-selection clause, the common law doctrine of forum *non conveniens* provides that a court may dismiss an action even when venue is proper if the defendant makes "a clear showing of facts which establish such oppression and vexation of a defendant so as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Dole Food Co.*, 303 F.3d at 1118 (citation and quotation marks omitted). The moving party must prove "(1) that there is an adequate alternative forum, and (2) that the balance of private and public interest factors favor dismissal." *Id.*

After the codification of 28 U.S.C. § 1404(a), the doctrine of forum *non conveniens* has

limited application, as explained by the Supreme Court:

> The common-law doctrine of forum *non conveniens* has continuing
> application in federal courts only in cases where the alternative
> forum is abroad, and perhaps in rare instances where a state or
> territorial court serves litigational convenience best. For the federal
> court system, Congress has codified the doctrine and has provided
> for transfer, rather than dismissal, when a sister federal court is the
> more convenient place for trial of the action.

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (citations and

quotation marks omitted).

## BACKGROUND[2]

### A.  HIS's Counterclaim Alleging Breach of Contract

In its counterclaim alleging breach of contract, HIS asserts that in the spring of 2019, HIS

and Edwards were in active discussions about HIS possibly becoming Edwards's exclusive

supplier of key components used in Edwards's integrated vacuum pump frame systems. The

parties also were discussing the potential for HIS to build subsystems for Edwards, or to

assemble subsystems into complete systems. In exchange, HIS would agree not to perform

similar work for any other seller or brand. By mid-May 2019, HIS had circulated a draft proposal

for Edwards's consideration. ECF 191, ¶ 37. Shortly thereafter, Edwards's key customer[3]

---

[2] HIS's three counterclaims are stated in HIS's Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Second Amended Complaint. ECF 191. HIS did not use sequentially numbered paragraphs throughout the entirety of that document. Instead, HIS sequentially numbered first its paragraphs for its Answer (¶¶ 1-205), did not number its paragraphs for its 19 affirmative defenses, and then sequentially numbered its paragraphs for its counterclaims beginning, for a second time, with ¶ 1. In this Opinion and Order, all paragraph citations to HIS's counterclaims in ECF 191 refer to the second set of HIS's sequentially numbered paragraphs.

[3] The parties know the identity of this customer and have requested that the Court not identify that customer in publicly filed documents.

reached out to HIS to request that HIS develop an "agnostic" integrated vacuum pump frame system, capable of being used with vacuum pumps and other equipment made by any approved supplier and not just by Edwards. Soon after receiving that invitation, HIS informed Edwards of HIS's new "opportunity" presented by this key customer. *Id*. ¶ 38.

Within a few weeks, Edwards and HIS began discussing a new topic, the possibility of Edwards acquiring HIS. *Id*. ¶ 45. HIS and Edwards formally began due diligence on June 21, 2019, and they agreed to a confidentiality and nondisclosure agreement (NDA) on that date. *Id*. ¶ 46; ECF 77-12 at 9-12 (copy of NDA). With HIS listed as the "Disclosing Party" and Edwards as the "Recipient," the parties agreed in the NDA that if HIS disclosed certain confidential information to Edwards about HIS's business, then the "Recipient [Edwards] shall use the Confidential Information solely for the Purpose" of evaluating a possible business transaction between Edwards and HIS. ECF 77-12 at 9. This confidential information included Edwards receiving "detailed information regarding HIS's strategic plans to develop an integrated vacuum pump frame system, including HIS's anticipated cost, margin, head count requirements, labor rates, and capital equipment spending for its new system." ECF 191, ¶ 47. The NDA also included the following choice of law provision and mandatory forum-selection clause:

> This Agreement and all matters relating hereto are governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflict of laws [*sic*] provisions of such State. Each Party irrevocably submits to the exclusive jurisdiction of the federal or state courts of Delaware in any such suit, action or proceeding.

ECF 77-12 at 11, ¶ 11.

HIS further alleges that on July 31, 2019, Edwards delivered to HIS a "lowball offer" to purchase HIS, which HIS rejected. ECF 191, ¶ 48. Edwards then "withdrew from the acquisition process." *Id*. HIS also contends that "[p]romptly after withdrawing from the acquisition process,

Edwards began a systematic effort to reduce its pricing just enough to target HIS's projected cost savings to [Edwards's primary customer]." *Id.* ¶ 49. HIS adds, on "information and belief," that Edwards began "soliciting HIS's suppliers and demanding price concessions to match HIS's confidentially disclosed cost targets" and that "Edwards used HIS's confidential information obtained pursuant to the NDA to make targeted representations to [Edwards's key customer] that [Edwards] could achieve cost savings in order to persuade [that customer] to defer its invitation for HIS to qualify" HIS's competitive integrated vacuum pump frame system, known as the "Liberty Frame System." *Id*; *see also id.* ¶¶ 29-31. Based on these allegations, HIS contends that Edwards breached the June 21, 2019 NDA. *Id*. ¶¶ 101-105.[4]

**B.  HIS's Counterclaims Alleging Monopolization and Attempted Monopolization**

HIS's other counterclaims allege monopolization and attempted monopolization, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. HIS identifies "integrated vacuum pump frame systems" as the relevant product market and the entire United States as the relevant geographic market. ECF 191, ¶¶ 3-5. HIS also alleges that the relevant market is highly concentrated, with two manufacturers collectively holding a 95 percent market share. *Id*. ¶ 12. HIS asserts that in the relevant market Edwards holds a 70 percent market share and the second largest competitor (a company other than HIS) holds a 25 percent market share. *Id*. ¶ 18. HIS also contends that the relevant market has "high barriers to entry" and "inelastic demand." *Id*. ¶ 18-20.

---

[4] In HIS's counterclaims (ECF 191), HIS sometimes refers to the date of the 2019 NDA as June 21, 2019 (*see* ¶ 46) and sometimes refers to its date as June 17, 2019 (*see* ¶ 102). Based on ECF 77-12 at 9-12, which appears to be a copy of the NDA at issue, the Court assumes that the correct date is June 21, 2019.

In addition, HIS alleges that HIS's potential entry into this market threatens Edwards's monopoly power and that Edwards's unlawfully maintains its monopoly power through exclusionary conduct. As alleged in HIS's antitrust counterclaims, Edwards

> exacerbated barriers to entry and suppressed competition through a *set of anticompetitive tactics that include imposing (or attempting to impose) non-compete covenants on its suppliers, employee intimidation, "no poach" agreements, customer threats, and bad faith litigation.* Edwards has deployed a combination of these tactics against HIS, first in an effort to prevent its market entry and, failing that, to burden HIS's ability to gain sales and market *share.*

*Id*. ¶ 32 (emphasis added).[5]

To summarize, HIS alleges that Edwards engaged in the following anticompetitive conduct: (1) Edwards demanded (but did not receive) a non-compete agreement from HIS in exchange for nominal status as a "preferred supplier" (*id*. ¶¶ 36-44); (2) an Edwards officer incorrectly assumed that Edwards and HIS had entered into a mutual "no-poach" agreement regarding each company's respective employees (*id*. ¶¶ 53-69); (3) Edwards "warned" one of HIS's customers, GlobalFoundries, "not to purchase [HIS's] Liberty Frame Systems because GlobalFoundries would risk having the systems ordered to be removed from its sub-fabs" (*id*. ¶ 33) and not to do "business with HIS, implying that doing so would risk retaliation from Edwards" (*id*. ¶ 72(c)); (4) after failing to acquire HIS, Edwards exploited HIS's confidential

---

[5] In its antitrust counterclaims, HIS also alleges that Edwards "ties" the sale of its integrated vacuum pump frame systems to related products and services (e.g., pumps, abatement systems, and aftermarket services). ECF 191, ¶¶ 26-27. In HIS's response to Edwards's motion to dismiss, however, HIS does not mention tying among HIS's recitation of Edwards's allegedly anticompetitive acts. Thus, for purposes of the pending motion, the Court will only consider the alleged anticompetitive conduct that HIS explicitly discusses in its response. *Accord Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (stating that a plaintiff who "makes a claim" in a complaint "but fails to raise the issue in response to a defendant's motion to dismiss" that claim "has effectively abandoned [that] claim").

information in breach of the NDA, to obstruct HIS's market entry (*id.* ¶¶ 45-52); and

(5) Edwards brought this lawsuit asserting meritless claims, including trade secret claims, for the

purpose of retaliating against HIS and its employees for HIS's use of competitive hiring

practices, raising HIS's costs, and chilling demand for HIS's competitive frame systems (*id.*

¶¶ 53-84).

## DISCUSSION

## A.  Edwards's Motion to Dismiss for Failure to State a Claim

Under Rule 12(b)(6), Edwards challenges both HIS's breach of contract counterclaim and

HIS's two antitrust counterclaims, arguing that HIS has failed to state claims upon which relief

can be granted. The Court first discusses HIS breach of contract counterclaim. The Court then

discusses HIS's two antitrust counterclaims, alleging monopolization and attempted

monopolization.

### 1.  HIS's Counterclaim Alleging Breach of Contract

HIS asserts that the June 21, 2019 NDA is a valid and binding contract between Edwards

and HIS and that Edwards breached that contract. The NDA contains a choice of law provision

selecting Delaware law. ECF 77-12, ¶ 11. Under Delaware law, the elements of a breach of

contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant

(or counterclaim defendant); and (3) resulting damage to the plaintiff (or counterclaim plaintiff).

*See Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011) (citation omitted).[6]

---

[6] Oregon law is not materially different. *See, e.g., Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) ("To state a claim for breach of contract, plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach[,] and defendant's breach resulting in damage to plaintiff." (citation and quotation marks omitted)).

Edwards argues that HIS's breach of contract claim fails "because HIS never alleges any actual facts—as opposed to unsupported speculation—that Edwards breached the NDA." ECF 228 at 28. Edwards adds, "HIS pleads that 'upon information and belief, Edwards began soliciting HIS's suppliers and demanding price concessions to match HIS's confidentially disclosed cost targets" and "[u]pon information and belief, Edwards used HIS's confidential information obtained pursuant to the NDA to make targeted representations to [Edwards's key customer] that it could achieve cost savings in order to persuade [that customer] to defer its invitation for HIS to qualify the Liberty Frame System." *Id*. (quoting ECF 191, ¶ 49); *see also* ECF 191, ¶104 ("Upon information and belief, Edwards breached the NDA by using confidential information regarding HIS's development of the Liberty Frame System to interfere with HIS's relationship with [Edwards's key customer] and persuade [that customer] to defer its solicitation of HIS to develop and qualify the Liberty Frame System.").

Edward cites a district court decision for the proposition that "[a]lthough a plaintiff may allege a fact upon information and belief where there is reason to believe that discovery would likely find evidence for the fact, such allegations require more than a mere hunch or guess." *Cooney v. BAC Home Loans Servicing*, 2012 WL 13042680, at *5 (D.N.J. March 28, 2012). Edwards also relies on another district court decision for the statement that, "[a]llegations based on information and belief, however, must set forth sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Stimson Lumber Co. v. Int'l. Paper Co*., 2010 WL 5128650, at *4 (D. Mont. Oct. 18, 2010) (simplified).

In response, HIS cites the Ninth Circuit's decision in *Soo Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017). In that case, the Ninth Circuit explained:

> The *Twombly* plausibility standard . . . does not prevent a plaintiff
> from pleading facts alleged upon information and belief where the

> facts are peculiarly within the possession and control of the
> defendant or where the belief is based on factual information that
> makes the inference of culpability plausible.

*Id*. at 928 (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

*Soo Park* involved a civil conspiracy claim under 42 U.S.C. § 1983, in which the plaintiff (the defendant in a murder trial) alleged on information and belief that the defendant in the civil lawsuit (the District Attorney) colluded with unnamed state officers to arrange for the unavailability of a defense witness at the criminal trial. The plaintiff's allegation was supported by facts, including that, during criminal proceedings against the plaintiff, the District Attorney brought unexpected felony charges against the witness, who then refused to testify, after which the District Attorney dropped the charges against that witness. *Id*. at 917. The district court granted the defendant's (the District Attorney) motion to dismiss, and the plaintiff appealed. The Ninth Circuit reversed, holding that the "complaint alleged facts that are suggestive of an agreement to engage in illegal conduct" and that "[w]hen the entire factual context is considered," the plaintiff's claim was plausible. *Id*. at 928.

Here, HIS alleges that shortly after HIS was approached by Edwards's key customer, asking Edwards to develop an "agnostic" integrated vacuum pump frame system, Edwards expressed interest in potentially acquiring HIS and sought disclosure from HIS of HIS's confidential business information, including costs, margins, labor rates, and capital equipment spending, all of which HIS provided under the NDA. ECF 191, ¶¶ 45-47. On July 31, 2019, after Edwards received HIS's confidential information, Edwards gave HIS a "lowball offer of approximately one-third of the minimum sale price recommended by HIS's investment banking consultant." *Id*. ¶ 48. HIS promptly rejected Edwards's lowball offer, and Edwards then withdrew from the acquisition process. *Id*. "Promptly after withdrawing from the acquisition process, Edwards began a systematic effort to reduce its pricing just enough to target HIS's

projected cost savings to [Edwards's key customer]." *Id*. ¶ 49. In August 2019, Edwards's key

customer "advised HIS that it was deferring its invitation for HIS to qualify a new integrated

vacuum pump frame system and was instead working with its existing supplier . . . to determine

whether it could create a value-engineered frame system that would sufficiently reduce costs to

meet [that customer's] price expectations." *Id*. ¶ 50. Edwards's key customer "did not reengage

with HIS regarding the qualification of the Liberty Frame System until several months later, in or

around the spring of 2020." *Id*. ¶ 51. HIS did not allege any of these facts "on information and

belief."

       Based on these facts (including their timing and all reasonable inferences from these

facts), HIS alleges on information and belief that "Edwards began soliciting HIS's suppliers and

demanding price concessions to match HIS's confidentially disclosed cost targets" and "that

Edwards used HIS's confidential information obtained pursuant to the NDA to make targeted

representations to [Edwards's key customer] that it [Edwards] could achieve cost savings in

order to persuade [the key customer] to defer its invitation for HIS to qualify the Liberty Frame

System." *Id*. ¶ 49. Also based on these facts, HIS states that it "believes" that Edwards was the

"existing supplier" with whom Edwards's key customer was working "to determine whether [the

existing supplier] could create a value-engineered frame system that would sufficiently reduce

costs to meet [the key customer's] price expectations." *Id*. ¶ 50. Finally, HIS alleges, again on

information and belief, "this delay in the qualification process was the direct result of Edwards's

interference with HIS's relationship with [Edwards's key customer] through the misuse of

[HIS's] confidential information that Edwards obtained pursuant to the NDA" and that the key

customer "reengaged with HIS only after it became clear that contrary to Edwards's initial

representations, Edwards was unable or unwilling to reduce costs sufficiently to satisfy [that customer's] expectations." *Id*. ¶ 51.

The key customer eventually "placed its first purchase order with HIS for a pilot system on July 15, 2020, and HIS shipped its first Liberty Frame System to [that customer] in August 2020." *Id*. ¶ 52. According to HIS, had that customer "not postponed its solicitation of HIS, HIS estimates that it would have qualified the Liberty Frame System at [that customer] by approximately December 2019" and that "the delay in [the customer's] decision to purchase and ultimately qualify the Liberty Frame System resulted in a revenue loss between December 2019 and July 2020 of approximately $15-30 million." *Id*. ¶ 52.

The Court finds that, based on the facts alleged by HIS not on information and belief, the allegations pleaded by HIS on information and belief are not *mere* "hunches" or "guesses." Those allegations instead set forth sufficient factual content to draw the *reasonable inference* that Edwards is liable for the alleged breach of contract, and that most of facts alleged by HIS on information and belief are particularly within the possession and control of Edwards. Thus, it is appropriate to consider the allegations made by HIS on information and belief. When all of HIS's allegations are considered, HIS has stated a claim for breach of the NDA sufficient to withstand Edwards's motion to dismiss. HIS may or may not eventually have sufficient facts to create a genuine issue for the jury and may or may not eventually persuade a jury. But at this stage of the litigation, HIS may proceed with its breach of contract claim. The Court denies Edwards's Rule 12(b)(6) motion to dismiss HIS's counterclaim alleging breach of contract.

### 2. HIS's Counterclaims Alleging Monopolization and Attempted Monopolization

To state a claim of monopolization, HIS must plausibly allege that (1) Edwards possesses "monopoly power in the relevant market"; and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). As explained by the Supreme Court: "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko*, 540 U.S. at 407. To state a claim of attempted monopolization, HIS must plausibly allege: "(1) that [Edwards] has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).[7]

Although Edwards denies each of these elements, Edwards's pending motion to dismiss HIS's antitrust counterclaims challenges *only* the sufficiency of HIS's pleading of the element of "anticompetitive conduct," which is required in both of HIS's two antitrust counterclaims. *See* ECF 228 at 18. As previously noted, HIS discusses five categories of alleged anticompetitive conduct by Edwards. The Court will discuss each in turn, but first a few comments about the concept of anticompetitive conduct may be helpful.

"Commentators have long described defining unlawful dominant firm conduct as one of the most uncertain areas of antitrust." ABA Antitrust Law Section, *Monopolization and Dominance Handbook* 75 (2d ed. 2021) (citation and quotation marks omitted). In *United States v. United Shoe Machinery*, Judge Wyzanski condemned a shoe machinery monopolist, noting:

> The facts show that (1) defendant has, and exercises, such
> overwhelming strength in the shoe machinery market that it
> controls that market, (2) this strength excludes some potential, and
> limits some actual, competition, and (3) *this strength is not*

---

[7] In addition, for a private plaintiff to recover money damages (indeed, automatic treble damages) in an antitrust action, § 4 of the Clayton Act, 15 U.S.C. § 15, requires a plaintiff to show causal antitrust injury, which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977).

> *attributable solely to defendant's ability, economies of scale,*
> *research, natural advantages, and adaptation to inevitable*
> *economic laws.*

110 F. Supp. 295 (D. Mass 1953), *aff'd*, 347 U.S. 521 (1954) (emphasis added).

Similarly, in *Grinnell Corp.*, the Supreme Court stated:

> The offense of monopoly under § 2 of the Sherman Act has two
> elements: (1) the possession of monopoly power in the relevant
> market and (2) *the willful acquisition or maintenance of that power*
> *as distinguished from growth or development as a consequence of*
> *a superior product, business acumen, or historic accident*.

384 U.S. at 570-71 (emphasis added). Indeed, this explanation of anticompetitive conduct was

repeated by the Supreme Court in *Trinko* in 2004.

Finally, one of the leading treatises in the field defines "monopolistic conduct" as acts

that

> (1) are reasonably capable of creating, enlarging or prolonging
> monopoly power by impairing the opportunities of rivals; and

> (2) either (2a) do not benefit consumers at all, or (2b) are
> unnecessary for the particular consumer benefits claimed for them,
> or (2c) produce harms disproportionate to any resulting benefits.

6C Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651a (Online ed. 2021). The Court

now addresses HIS's five categories of anticompetitive conduct allegedly committed by

Edwards.

### a. Edwards's Demand for a Non-Compete Agreement

HIS alleges that the day after HIS informed Edwards that Edwards's key customer had

solicited HIS to develop an "agnostic" integrated vacuum pump frame system, Edwards returned

revisions to HIS's draft supplier agreement. According to HIS, Edwards's new proposal

"eliminated the proposed agreement's benefit to HIS" by deleting supplier exclusivity and,

instead, substituted a requirement that in exchange for "nominal status as a preferred supplier,"

HIS must stipulate to a "Non-Compete/Non-Solicitation" term. ECF 191, ¶ 40. HIS further

alleges:

> In short, Edwards sought a covenant not to compete in the
> integrated vacuum pump frame systems market and forced
> intellectual property transfer from HIS in exchange for no material
> benefit to HIS save for a non-committal prospect of increased sales
> to Edwards. Edwards's proposal, had HIS accepted, would have
> directly undercut [the key customer's] effort to diversify its supply
> chain and realize cost savings by stimulating competition.

*Id*. ¶ 42. HIS also states: "Although HIS rejected the preferred supplier agreement, Edwards's

demands carried a dangerous probability of inducing HIS to stay out of the market precisely

because HIS depends significantly on component sales to Edwards as a result of Edwards's

existing monopoly." *Id*. ¶ 43.

In its motion to dismiss, Edwards argues that although non-compete and non-solicitation

agreements might be actionable as antitrust offenses under certain circumstances, the absence of

such an agreement cannot satisfy the exclusionary conduct requirement of HIS's antitrust

counterclaims. As the Ninth Circuit has held:

> [D]irect evidence of intent alone, without corroborating evidence
> of conduct, cannot sustain a claim of attempted
> monopolization. . . . Direct evidence of intent to vanquish a rival in
> an honest competitive struggle cannot help to establish an antitrust
> violation. It also must be shown that the defendant sought victory
> through unfair or predatory means. Evidence of conduct is thus
> indispensable.

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1028 (9th

Cir. 1981).

In response, HIS argues that Edwards's proposal of a preferred supplier agreement

containing a non-compete clause, which HIS rejected, is itself an anticompetitive act that

supports HIS's claim of attempted monopolization.[8] In support of its argument, HIS relies on the

Fifth Circuit's decision in *United States v. American Airlines, Inc*., 743 F.2d 1114 (5th

Cir. 1984). In that case, the Fifth Circuit held that, under the specific economic conditions

presented, an unaccepted offer to fix prices made by one competitor to another in a two-firm

market with high barriers to entry adequately stated a claim for attempted monopolization. *Id*.

at 1118-19.

In reply, Edwards makes two arguments. First, relying on *Transamerica Computer Co., v.

International Business Machines Corp*., 698 F.2d 1377 (9th Cir. 1983), Edwards argues that the

Fifth Circuit's holding in *American Airlines* is inconsistent with earlier binding Ninth Circuit

precedent. Second, Edwards argues that even if *American Airlines* is not inconsistent with Ninth

Circuit law, it is factually and legally distinguishable from the pending case. The Court rejects

Edwards's first argument but accepts its second.

In *Transamerica*, a company that supplied the capital needs of manufacturers of "plug-

compatible" computer peripherals brought claims of monopolization and attempted

monopolization against a major supplier of computer central processing units and peripherals.

The plaintiff, Transamerica, challenged IBM's leasing practices, design changes, and pricing

decisions. After a jury trial that lasted 120 days, including ten days of deliberation, the court

found the jury was deadlocked. Under a pretrial stipulation, the district judge then became the

trier of fact. Next, the district court ruled for IBM on all major issues, holding that IBM was not

---

[8] HIS offers this theory only in support of its claim of attempted monopolization, not
actual monopolization. *See* ECF 191, ¶ 43 (referring to the creation of a "dangerous probability"
of market dominance, which is an element of attempted monopolization but not actual
monopolization). Indeed, it is difficult to see how an unaccepted offer could ever satisfy the
causal antitrust injury requirement needed in a private antitrust claim seeking money damages
because an unaccepted offer would not be the "cause" of any material result in the marketplace.

a monopolist, and even if it were, its leasing program, design changes, and pricing behavior did

not unreasonably restrain competition. *Transamerica*, 698 F.2d at 1381. In addition, the district

court held that IBM had not attempted to monopolize. *Id*.

The Ninth Circuit affirmed the district court's result but modified the district court's test

for predatory pricing. In reciting the basic elements of monopolization and attempted

monopolization, the Ninth Circuit stated:

> Conduct that does not constitute "willful acquisition or
> maintenance" of monopoly power (thus precluding establishment
> of the offense of monopolization) cannot constitute the "predatory
> or anticompetitive conduct" required to establish the offense of
> attempt to monopolize. *See CalComp*, 613 F.2d at 738, quoting 3
> P. Areeda & D. Turner, *Antitrust Law* ¶ 828, at 321 (1978)
> ("conduct lawful for a monopolist must, a fortiori, be excluded as a
> basis for the attempt offense."). We will analyze IBM's conduct
> with this principle in mind. We will assume that IBM possessed
> monopoly power. If IBM's conduct proves lawful despite that
> assumption, then, *a fortiori*, IBM's conduct could not constitute an
> attempt to monopolize, thereby eliminating the need to consider
> this offense.

*Id*. at 1382. Edwards relies on the Ninth Circuit's statement in *Transamerica* that "[c]onduct that

does not constitute 'willful acquisition or maintenance' of monopoly power (thus precluding

establishment of the offense of monopolization) cannot constitute the 'predatory or

anticompetitive conduct' required to establish the offense of attempt to monopolize." This

statement, however, merely expresses the unremarkable proposition that conduct that is lawful

(and not anticompetitive) for a monopolist cannot be considered anticompetitive for purposes of

stating a claim of attempted monopolization. In *Transamerica*, however, there were no

"unaccepted" offers to fix price or otherwise to restrain trade. Thus, nothing in *Transamerica*,

properly understood, is inconsistent with the Fifth Circuit's decision in *American Airlines*. The

Court rejects Edwards's argument on this point.

Edwards's second argument fares better. *American Airlines* is both factually and legally distinguishable from the pending dispute. This is so for three independent reasons. But first, it may be helpful for provide further background on the *American Airlines* decision.

As discussed in that case, the chief executive officer of American Airlines (Robert Crandall) offered to the chief executive officer of Braniff International Airways (Howard Putnam) a blatant—and unlawful—price-fixing agreement between two competing airlines in several two-firm city-pair markets with high barriers to entry. If Putman had accepted Crandall's offer, there is no doubt that there would have immediately been a completed *per se* unlawful antitrust violation, subjecting both executives to criminal liability. The United States brought a civil enforcement action, seeking injunctive relief against American Airlines and Crandall. The United States alleged that American Airlines, through this unaccepted offer, had "attempted to monopolize" numerous city-pair markets for air travel under circumstances involving high (indeed, insurmountable, at least for a time) barriers to entry, based on landing slot restrictions imposed by the Federal Aviation Administration after the PATCO strike of air traffic controllers and President Reagan's firing of the striking employees. The district court dismissed the government's complaint under Rule 12(b)(6), but the Fifth Circuit reversed.

In its ruling, the Fifth Circuit held that, among other things, the dangerous probability element of attempted monopolization was satisfied because

> if Putnam had accepted Crandall's offer, the two airlines, at the moment of acceptance, would have acquired monopoly power. At that same moment, the offense of joint monopolization would have been complete. . . .
>
> \*   \*   \*
>
> Both Crandall and Putnam were the chief executive officers of their airlines; each arguably had the power to implement Crandall's plan. The airlines jointly had a high market share in a market with high barriers to entry. American and Braniff, at the

>moment of Putnam's acceptance, would have monopolized the
>market. Under the facts alleged, it follows that Crandall's proposal
>was an act that was the most proximate to the commission of the
>completed offense that Crandall was capable of committing.
>Considering the alleged market share of American and Braniff, the
>barriers to entry by other airlines, and the authority of Crandall and
>Putnam, the complaint sufficiently alleged that Crandall's proposal
>had a dangerous probability of success.

*American Airlines*, 743 F.2d at 1118-19.

Here, the Court concludes that the *American Airlines* case has no application in the

pending dispute for three independent reasons. First, in *American Airlines*, had American's offer

to fix price been accepted by Braniff, at that moment of acceptance, there would have been the

creation of joint monopoly power. That, however, is not the situation here. Had HIS accepted

Edwards's proposed preferred supplier agreement containing a non-compete clause, that would

not have created monopoly power at that moment of acceptance.

Second, in *American Airlines*, the act that would have created monopoly power (the price

fix) was *per se* unlawful and thus unquestionably illegal. That, however, is not the situation here.

At the time of Edwards's offer to enter into a preferred supplier agreement containing a

non-compete clause, HIS and Edwards were (and remain) in a vertical supply relationship.

Ancillary non-compete agreements among participants in a vertical supply relationship, however,

are not *per se* unlawful but instead are evaluated under a "Rule of Reason." *See generally Nat'l*

*Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 689 (1978) ("The Rule of Reason . . . has

been regarded as a standard for testing the enforceability of covenants in restraint of trade which

are ancillary to a legitimate transaction[.]"). Relatedly, vertical nonprice restraints are evaluated

under the Rule of Reason. *See generally Cont'l T.V., Inc. v. G.T.E. Sylvania, Inc*., 433 U.S. 36,

49-50 (1977) (holding that "*per se* rules of illegality are appropriate only when they relate to

conduct that is manifestly anticompetitive"). Under a Rule of Reason analysis, it is far from clear

whether the proposed preferred supplier agreement containing a non-compete clause would be found to be manifestly anticompetitive.

Finally, in *American Airlines*, the government brought that civil action seeking injunctive relief. Here, HIS's attempted monopolization counterclaim seeks treble damages, which requires, in addition to the three basic elements of attempted monopolization, a showing of causal antitrust injury.[9] As noted earlier, it is difficult to see how an *unaccepted* offer to enter into a preferred supplier agreement with a non-compete clause can *cause* antitrust injury to HIS.[10] This further distinguishes the pending case from *American Airlines*.

### b. Edwards's Assumed "No-Poach" Agreement

HIS alleges that after HIS hired several of Edwards's employees, Edwards sent a communication to HIS stating,

> I thought we mutually agreed not to hire each other's employees.
> Can you give me any insight into what has changed and why
> you're not honoring your commitment?

ECF 191, ¶ 56. HIS "promptly responded that HIS never agreed that Edwards and HIS would not hire each other's employees and that the agreement suggested by [Edwards] would be illegal." Id.

In its motion to dismiss, Edwards argues that although a non-solicitation agreement might be actionable as an antitrust offense under certain circumstances, the absence of such an agreement does not satisfy the "exclusionary conduct" requirement of HIS's antitrust counterclaims. Edwards's argument is similar to its argument regarding its unaccepted preferred supplier agreement. For the same reasons that the Court just held that Edwards's unaccepted

---

[9] *See* n.7, *supra*.

[10] *See* n.8, *supra*.

offer to enter into a preferred supplier agreement is not an anticompetitive act, the Court also

holds that Edwards's apparently erroneous belief that Edwards and HIS had entered into an

agreement not to hire (or "poach") each other's employees is not an anticompetitive act that can

support HIS's claims of monopolization or attempted monopolization.

### c.   Edwards's "Warning" to HIS's Customer GlobalFoundries

HIS alleges that Edwards had warned one of HIS's customers, GlobalFoundries, that it

should not "purchase [HIS's] Liberty Frame Systems because GlobalFoundries would risk

having the systems ordered to be removed from its sub-fabs" (ECF 191, ¶ 33) and not to do

"business with HIS, implying that doing so would risk retaliation from Edwards" (*id*. ¶ 72(c)).

Edwards did not explicitly mention this allegation in its motion to dismiss. In its response to

Edwards's motion, HIS stated:

> And Edwards simply ignores HIS's allegation that it intimidated
> GlobalFoundries—a large semiconductor chip manufacturer and
> mutual customer of Edwards and HIS—not to purchase Liberty
> Frame Systems. Representatives of GlobalFoundries have
> indicated to HIS that GlobalFoundries adopted a "wait and see"
> approach by reducing purchases of Liberty Frame Systems.

ECF 235 at 8; see also id. at 32.

In its reply, Edwards argued:

> HIS tries to argue that Edwards's statements to its customers
> regarding its lawsuit against HIS somehow rise to the level of a
> separate "category of exclusionary conduct," (Opp'n at 9), even
> though the allegations all relate to the alleged "sham" litigation
> section of its Counterclaims. (Countercl. ¶ 72.) Specifically, HIS
> alleges "three separate occasions" when an Edwards employee told
> a customer "not to do business with HIS." (Opp'n at 26.) HIS
> further alleges that Edwards informed customers that it would file
> a lawsuit against HIS. (Countercl. ¶ 72.) HIS cites no precedent for
> such commercial speech to constitute anticompetitive conduct.
> Disparagement of competitors is only actionable in the Ninth
> Circuit when the representation is "(1) clearly false, (2) clearly
> material, (3) clearly likely to induce reasonable reliance, (4) made
> to buyers without knowledge of the subject matter, (5) continued

for prolonged periods, and (6) not readily susceptible of
neutralization or other offset by rivals."

ECF 236 at 17-18. Edwards then cites *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich*

*Legal & Pro. Publ'ns, Inc*., 108 F.3d 1147 (9th Cir. 1997).

In that case, the Ninth Circuit explained:

> While the disparagement of a rival or compromising a rival's
> employee may be unethical and even impair the opportunities of a
> rival, its harmful effects on competitors are ordinarily not
> significant enough to warrant recognition under § 2 of the Sherman
> Act. We therefore insist on a preliminary showing of significant
> and more-than-temporary harmful effects on competition (and not
> merely upon a competitor or customer) before these practices can
> rise to the level of exclusionary conduct.
>
> *    *    *
>
> To prove that Harcourt's false and misleading advertising
> constituted exclusionary conduct, the disparagement must
> overcome a presumption that the effect on competition of the fliers
> was de minimis. [A] plaintiff may overcome de minimis
> presumption by cumulative proof that the representations were
> [1] clearly false, [2] clearly material, [3] clearly likely to induce
> reasonable reliance, [4] made to buyers without knowledge of the
> subject matter, [5] continued for prolonged periods, and [6] not
> readily susceptible of neutralization or other offset by rivals.
> American must satisfy all six elements to overcome de minimis
> presumption. Otherwise, American fails to prove its claim.

*Id.* at 1151-52 (citations and quotation marks omitted; alterations in original). The Court agrees

with Edwards and holds that HIS has failed adequately to plead more-than-temporary harmful

effects on competition (and not merely upon a competitor or customer). Thus, HIS has failed to

plead exclusionary conduct relating to Edwards's alleged comments to GlobalFoundries (or

others).

### d.  Edwards's Alleged Breach of the 2019 NDA

The Court has already discussed HIS's counterclaim alleging breach of contract relating

to the June 21, 2019 NDA. HIS also contends that Edwards's alleged breach of the NDA to

"exploit" HIS's confidential information and to obstruct HIS's market entry is anticompetitive conduct that supports HIS's antitrust counterclaims. In its motion to dismiss, Edwards argues that HIS's breach of contract theory cannot form a basis for an antitrust claim. Edwards cites *Pool Water Products v. Olin Corp*., 258 F.3d 1024 (9th Cir. 2001), for the proposition that "private plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent. To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior." *Id*. at 1034.[11] In response, HIS argues that Edwards did not outcompete HIS by delivering to Edwards's key customer a value-engineered system at a superior price. Nor does HIS allege that it lost sales or was otherwise damaged in its business due to Edwards's lower prices. Rather, HIS contends that Edwards used HIS's confidential information to make representations that Edwards would reduce prices that misled Edwards's key customer into deferring business with HIS. ECF 191, ¶¶ 49-51. According to HIS, this is an entirely different class of conduct than mere aggressive price competition.

Antitrust laws protect "*competition*, not *competitors*." *Brown Shoe Co. v. United States*, 370 U.S 294, 320 (1962) (emphasis added). Thus, an antitrust plaintiff must demonstrate not only that the defendant engaged in unfair or predatory tactics, but also that those tactics allowed the defendant to maintain or come dangerously close to obtaining monopoly status. *See Spectrum Sports*, 506 U.S. at 459. Indeed, not "even an act of pure malice by one business competitor against another" will alone state an antitrust violation. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). HIS argues that Edwards's breach of contract satisfies this test. The Court disagrees.

---

[11] *See also* n.7, *supra* (discussing the requirement of causal antitrust injury).

"[A] claimed breach of contract by unreasonable conduct, *standing alone*, should not give rise to antitrust liability." *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1368 (9th Cir. 1992) (emphasis added); *see also* 2B Areeda & Hovenkamp, *Antitrust Law*, ¶ 709d1 ("A breach of contract is not ordinarily an antitrust violation."); 3A Areeda & Hovenkamp, *Antitrust Law*, ¶ 782m ("It is not antitrust's purpose to regulate ordinary business contracts."). Instead, antitrust liability will only be predicated "on conduct that also happens to create a contract dispute" when that conduct is "anticompetitiv[e] and without a legitimate business reason." *City of Vernon*, 955 F.2d at 1368. In *City of Vernon*, the City had a colorable—although ultimately unsuccessful[12]—antitrust claim against Edison based on Edison's alleged breach of contract because Edison's allegedly breaching conduct, intermittently refusing to transmit electricity purchased from other suppliers to the City over Edison's lines, was not "a single incident," but instead was "relatively long-term activity aimed at crushing a competitor." *Id.* at 1368-69. That is not what HIS has alleged here.

Nor is reticence to premise antitrust liability on a single instance of bad conduct aimed at a single competitor unique to antitrust claims relying on breach of contract. *See Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) ("Isolated tortious activity alone does not constitute exclusionary conduct for purposes of a § 2 violation, absent a significant and more than a temporary effect on competition, and not merely on a competitor or customer."); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1109 (D. Colo. 2004) (finding that a single incident of the defendant "secretly hir[ing]" one of the

---

[12] The Ninth Circuit ultimately granted Edison summary judgment, holding that the evidence that Edison interrupted the City's service was insufficient to "lead a rational trier of fact to find for [the City]." *Id.* at 1369 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

plaintiff's employees and then having that employee and other "enter[] [the plaintiff's] office at night and remove[] and destroy[] various files" was a "single event" that did "not amount to anticompetitive conduct"); *cf. Conwood Co.*, 290 F.3d at 784-88 (affirming a jury's finding of a § 2 violation when the defendant engaged in a "pervasive practice" of damaging a single competitor's property and making misrepresentations about the competitor);. Because HIS has not alleged pervasive and long-term activity that has had more than a temporary effect on a single competitor, HIS's allegations regarding the June 21, 2019 NDA do not allege anticompetitive conduct sufficient to support a claim for monopolization or attempted monopolization.[13]

### e. Edwards's Filing of this Lawsuit

HIS alleges that Edwards brought this lawsuit asserting meritless claims, including trade secret claims, for the purposes of: (1) retaliating against HIS and its employees for HIS's use of competitive hiring practices; (2) raising HIS's costs; and (3) chilling demand for HIS's competitive frame systems. ECF 191, ¶¶ 53-84. In its motion to dismiss, Edwards argues that the *Noerr-Pennington* doctrine immunizes this lawsuit from challenge under the antitrust laws.[14] "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct," including "the use of the channels and procedures of state and federal courts." *Sosa v. DIRECTV, Inc*., 437 F.3d 923, 929-30 (9th Cir. 2006) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S.

---

[13] As previously noted, however, HIS has sufficiently alleged a claim for breach of contract.

[14] The doctrine derives its name from two cases, *E. R.R. Presidents Conf. v. Noerr Motor Freight*, 365 U.S. 127 (1961), and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

508, 510-11 (1972)). "Although *Noerr-Pennington* immunity extends to judicial proceedings, it does not protect persons engaging in sham litigation." *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc*., 863 F.3d 1178, 1187 (9th Cir. 2017). The Ninth Circuit has "recognized three circumstances when litigation might be a sham." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005).

The "sham exception" that appears to be most relevant in this lawsuit, and upon which HIS relies, requires that "the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships."[15] *Id*. The Supreme Court has explained these two necessary criteria for sham litigation as follows:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.

*Pro. Real Est. Invs. v. Columbia Pictures Indus*., 508 U.S. 49, 60-61 (1993) ("*PRE*") (quotation marks omitted); *see also Int'l Longshore*, 863 F.3d at 1187-88. "The existence of probable cause

---

[15] The second circumstance for when litigation might be a sham is "if the alleged anticompetitive behavior is the filing of a series of lawsuits." *Freeman*, 410 F.3d at 1184; *cf. Int'l Longshore*, 863 F.3d at 1187 (noting that "[t]wo sham suits cannot amount to a whole series of legal proceedings"). The third circumstance may arise "if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court." *Freeman*, 410 F.3d at 1184.

to institute legal proceedings precludes a finding that an antitrust defendant has engaged in a

sham litigation." *PRE*, 508 U.S. at 62.

Edwards filed its Complaint in this lawsuit on September 29, 2020, against HIS and 13 of

HIS's employees, including many who previously worked for Edwards. ECF 1. On

November 16, 2020, Edwards moved for a preliminary injunction. ECF 41. In that motion,

Edwards sought to enjoin HIS from making, selling, offering to sell, shipping, or otherwise using

any product containing Edwards's asserted trade secrets. After limited discovery relating to

Edwards's motion, Edwards informed HIS and the Court on February 12, 2021 that Edwards was

narrowing the scope of its preliminary injunction motion to allege *only* a breach of contract claim

against HIS arising from what Edwards alleged was HIS's unauthorized use of Edwards's

custom-designed '541 Bellows based on "Terms and Conditions" that were not alleged in

Edwards's original Complaint.

Edwards has twice amended its Complaint, with the Second Amended Complaint being

the currently operative pleading. Edwards also voluntarily dismissed eight of the Individual

Defendants originally named. On May 10, 2021, after a three-day evidentiary hearing, the Court

found that Edwards had shown that it was likely to prevail on its claim that HIS breached the

contractual obligations stated in the Terms and Conditions, relating to the '541 Bellows. The

Court granted Edwards's motion for preliminary injunction. ECF 212.

In support of its motion to dismiss that portion of HIS's antitrust counterclaims focused

on Edwards's filing of this lawsuit, Edwards invokes the *Noerr-Pennington* doctrine. Among

other things, Edwards argues that in granting in part Edwards's motion for preliminary

injunction, the Court has determined that Edwards is likely to succeed against HIS on the merits

of Edwards's breach of contract claim based on the Terms and Conditions relating to the '541

Bellows. According to Edwards, this precludes HIS's assertion that Edwards's lawsuit is "objectively baseless." Edwards explains that the Supreme Court in *PRE* stated: "A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham." *PRE*, 508 U.S. at 60 n.5.

In response, HIS argues that the specific claim upon which the Court granted Edwards preliminary injunctive relief was not even alleged in Edwards's original Complaint and was only added months after Edwards began this lawsuit. HIS also states that Edwards has voluntarily dismissed its claims against eight of the 13 Individual Defendants. Finally, HIS urges the Court to follow the approach used in *In re Wellbutrin SR Antitrust Litigation*, 749 F. Supp. 2d 260, 266 (E.D. Pa. 2010). In that case, the district court declined to dismiss the plaintiffs' antitrust claim alleging "sham litigation" in a mixed-claim case, explaining that "[d]ismissing plaintiffs' claims at this point would ignore the reality that the [claim alleged to lack an objective basis], in and of itself, was sufficient to cause antitrust damage." *Id.* at 266.

In reply, Edwards cites *IPtronics Inc. v. Avago Techs. U.S., Inc.*, 2015 WL 5029282 (N.D. Cal. Aug. 25, 2015), for the proposition that "a plaintiff who prevails on some claims but not others in a single lawsuit can claim the *Noerr-Pennington* immunity is the dominant view in [the Ninth C]ircuit and around the country." *Id.* at *6. In *Avago*, however, the district court addressed multiple patent infringement claims brought against multiple defendants and concluded that

> the *PRE* analysis may be applied solely to the '456 Patent infringement claims against IPtronics, which constituted Avago's "lawsuit" against IPtronics. Based upon the unredacted information before the Court, it appears that the '595 Patent infringement claims and accused products in the ITC action were severable from the '456 Patent infringement claims and accused products. In other words, Avago could have filed a separate complaint against IPtronics and Mellanox/FCI concerning the products that infringed

> only the '456 Patent. Assuming as true the assertion that Avago
> had no reasonable basis for accusing IPtronics, that Avago chose to
> join its frivolous claims against IPtronics to an otherwise valid
> lawsuit against other defendants should not preclude IPtronics
> from invoking the Sherman Act.

*Id*. In addition, the district court in *Avago* noted the Ninth Circuit's decision in *Freeman*,

explaining that "[b]ecause the *Noerr–Pennington* doctrine grows out of the Petition Clause, its

reach extends only so far as necessary to steer the Sherman Act clear of violating the First

Amendment." 2015 WL 5029282, at *6 (alteration in original) (quoting *Freeman*, 410 F.3d

at 1184). The court in *Avago* denied the defendant's motion to dismiss the plaintiff's antitrust

claim, concluding:

> In sum, the Court finds that IPtronics' allegations of objective
> baselessness are sufficiently well-pleaded to circumvent Avago's
> claim to *Noerr-Pennington* immunity at this stage. This is not to
> say that it is smooth sailing for IPtronics from this point forward,
> as the arguments by Avago that this Court rejected on a motion to
> dismiss may gain more traction on a more fully developed record.
> At a minimum, Avago's arguments demonstrate that there may be
> significant challenges to IPtronics' ability to prove objective
> baselessness down the road.

*Avago*, 2015 WL 5029282 at *8.

Many of the same considerations found in *Avago* apply here. In addition, Edwards added

the sole claim on which it prevailed at the preliminary injunction stage *months after* Edwards's

filed its original Complaint. This fact provides a further ground for applying HIS's antitrust

counterclaims "sham exception" argument to Edwards's originally alleged trade secret claims,

notwithstanding Edwards's partially successful preliminary injunction motion on one of its later-

filed breach of contract claims.

Regarding Edwards's trade secret claims, HIS alleges in its antitrust counterclaims the

following:

> What Edwards has concealed from the Court (and, through its
> abuse of the "OAEO" designation under the Protective Order, from
> the semiconductor industry generally) is that most if not all of the
> "trade secrets" identified in its disclosure are such basic
> engineering techniques and common industry knowledge that no
> reasonable person in Edwards's position could have genuinely
> believed them to be trade secrets. Throughout its 135-page
> disclosure (ECF No. 35-1), Edwards repeatedly misrepresents that
> it possesses "trade secrets" that it knows are in fact not confidential
> or proprietary.

ECF 191, ¶ 74. Further, HIS alleges:

> Contrary to its allegations in this lawsuit, Edwards does not
> maintain confidentiality of the various basic engineering
> techniques and standard off-the-shelf components that it claims as
> "trade secrets." For example, Edwards has allowed the public
> access to its integrated vacuum pump frame systems during open
> house events without even requiring guests to sign a sign in sheet.
> Photographs of the SynErgis system that show the location or use
> of several of Edwards's alleged trade secrets are readily available
> to anyone with an internet connection. *See, e.g.*,
> https://pamplinmedia.com/but/239-news/440111-349658-edwards-
> putsdown-new-roots-in-silicon-forest-pwoff. As Mr. Romeo
> testified during the preliminary injunction hearing, not only were
> Edwards's employees not instructed to keep various components of
> the SynErgis system a secret, but they were also at times
> encouraged to widely share these features as part of Edwards's
> sales, marketing, and employee recruiting efforts.

ECF 191, ¶ 77.

To paraphrase the district court's decision in *Avago*, the Court here finds that HIS's

allegations that Edwards's trade secret claims are objectively baselessness are sufficiently

pleaded to circumvent Edward's claim to *Noerr–Pennington* immunity at this stage. To

paraphrase *Avago* further, this is not to say that it is "smooth sailing" for HIS from this point

forward, and the arguments by Edwards on its motion to dismiss that the Court rejects today

"may gain more traction on a more fully developed record." Indeed, if Edwards prevails at trial

on any of its trade secret claims, or possibly even if Edwards's trade secret claims can withstand

a motion for summary judgment,[16] that may well be the end of HIS's antitrust counterclaims, or at least those based on Edwards's filing of this lawsuit.

## B.  Edwards's Alternative Motion to Dismiss Based on Forum *Non Conveniens*

Edwards previously moved under 28 U.S.C. § 1404(a) to transfer venue of HIS's counterclaims (and only HIS's counterclaims) to the District of Delaware. ECF 216. In support of that motion, Edwards invoked the mandatory forum selection clause contained in the contract that Edwards allegedly breached, the June 21, 2019 NDA. The Court denied Edwards's motion, concluding that Edwards had waived or forfeited its right to benefit from that forum selection clause based on Edwards's litigation conduct. ECF 233. The Court sees no reason to revisit that ruling. Accordingly, the Court will not consider the forum-selection clause now in evaluating Edwards's motion to dismiss based on forum *non conveniens*. The Court stands by its earlier ruling that Edwards's litigation conduct in this case results in a waiver or forfeiture of that clause.

This leaves Edwards only with the common law doctrine for forum *non conveniens*. The Court finds that Edwards has not made "a clear showing of facts which establish such oppression and vexation of a [counterclaim] defendant so as to be out of proportion to [a counterclaim] plaintiff's convenience." *See Dole Food*, 303 F.3d at 1118. In addition, Edwards has not shown that defending against HIS's counterclaims here presents one of the "rare instances" where "a state or territorial court serves litigational convenience best." *See Sinochem Int'l*, 549 U.S.

---

[16] Whether Edwards's defeating HIS's motion for summary judgment on Edwards's trade secret claims (if that were to occur) would be sufficient to show that those claims were not objectively baseless for purposes of *Noerr-Pennington* immunity is a question that may benefit from further briefing and study at the appropriate time. *See generally In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 362-64 (D. Mass. 2004) (discussing issue).

at 430. Accordingly, the common law doctrine of forum *non conveniens* does not support

Edwards's alternative motion, and that motion is denied.

## C.  Partial Reconsideration of Edwards's Motion to Bifurcate and Stay Discovery

Edwards previously moved to bifurcate for discovery and trial *all* counterclaims asserted

by HIS. ECF 204. The Court denied Edwards's motion, concluding that the motion was

premature. ECF 215. In that ruling, the Court explained: "Here, whether bifurcation would result

in increased convenience and judicial economy or would reduce the risk of jury confusion and

unfair prejudice cannot be determined at this stage of the litigation." *Id*. at 4. Since then,

Edwards filed its pending motion to dismiss HIS's three counterclaims under Rule 12(b)(6),

among other grounds. That motion has been fully briefed, and the Court has had the benefit of

counsel's oral argument on these issues. It now is appears to the Court that Edwards's motion to

bifurcate for discovery and trial, at least regarding HIS's antitrust counterclaims, has merit.

As Edwards argued in its motion to bifurcate,

> Courts routinely bifurcate antitrust claims from complex legal
> issues such as intellectual property and unfair competition claims.
> *See, e.g., In re Data Gen. Corp. Antitrust Litig*., 529 F. Supp. 801,
> 804, n.2 (N.D. Cal. 1981) (rev'd on other grounds) (bifurcating
> antitrust claims from underlying trade secrets claim)[.] . . .
> Bifurcation "enhance[s] the parties' right to [a] jury trial by
> making the issues the jury must consider less complex." *Warner
> Lambert Co. v. Purepac Pharm. Co*., No. Civ.A. 98-02749 (JCL),
> 2000 WL 34213890, at *11 (D.N.J. Dec. 22, 2000) (quoting *In re
> Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986)[.]

ECF 204 at 10. In addition, Edwards noted that in *Ecrix Corp. v. Exabyte Corp*., 191 F.R.D. 611

(D. Colo. 2000), the district court explained:

> Bifurcation allows for (1) quicker resolution of the [intellectual
> property] infringement issue as there is less discovery required,
> and (2) judicial economy as the antitrust and unfair competition
> claims may not have to be heard if [intellectual property]
> infringement is proved in the first trial.

*Ecrix*, 191 F.R.D. at 614.

Applying these considerations here, there does not appear to be any significant benefit to be achieved from staying HIS's breach of contract counterclaim. There is, however, significant benefit to be had from staying HIS's antitrust counterclaims. Antitrust claims by their nature are more complex and expensive to litigate than litigating a discrete breach of contract claim.

Moreover, all that remains of HIS's antitrust counterclaims is HIS's contention that Edwards engaged in anticompetitive conduct by filing an objectively baseless lawsuit, or at least by filing objectively baseless trade secret claims. As previously discussed, to refute Edwards's *Noerr-Pennington* defense, HIS will need to show that Edwards's trade secret claims are a "sham," both objectively and subjectively.

Whether Edwards's trade secret claims are objectively baseless may be informed by the jury's verdict on those claims, or possibly even by the Court's ruling on a motion for summary judgment.[17] Also, discovery on the subjective prong of the issue of sham litigation will be both expensive and intrusive—and completely unnecessary if the objective prong is not satisfied. Edwards's defense against HIS's monopolization and attempted monopolization counterclaims will also involve lengthy, complex, and expensive litigation over the proper market definition and the assessment of market power (including barriers to entry) in that properly defined market. All of that would be wasteful if HIS cannot show that Edwards's trade secret claims were objectively baseless.

Accordingly, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, the Court bifurcates HIS's antitrust counterclaims from the rest of this litigation. The litigation will move forward, through trial if necessary, on Edwards's claims and HIS's breach of contract

---

[17] *See* n.16, *supra*.

counterclaim. The Court will then resolve HIS's antitrust counterclaims after Edwards's claims and HIS's breach of contract counterclaim have been determined. Further, the Court stays all discovery that is related only to HIS's antitrust counterclaims. In other words, if discovery is otherwise properly related to the prosecution or defense of any of Edwards's claims or HIS's breach of contract counterclaim, that discovery may proceed, even if it also may be relevant to HIS's antitrust counterclaims. If, however, discovery is related only to HIS's antitrust counterclaims, it may not proceed at this time, absent stipulation of the parties or further order of the Court.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Edwards's Motion to Dismiss HIS's Counterclaims (ECF 228) as stated in this Opinion and Order. The Court also BIFURCATES HIS's antitrust counterclaims and STAYS any discovery that is related only to HIS's antitrust counterclaims, as stated in this Opinion and Order. HIS's breach of contract counterclaim, and all appropriate discovery related to that counterclaim, may proceed.

**IT IS SO ORDERED**.

DATED this 23rd day of August, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge